R.J. MANAGEMENT COMPANY, Plaintiff-Appellant and Cross-Appellee, v. SRLB DEVELOPMENT CORPORATION, Defendant-Appellee and Cross-Appellant.

Second District    No. 2—02—0842

Opinion filed February 10, 2004.—Rehearing denied April 23, 2004.

958

Robert T. O'Donnell and Nikoleta Lamprinakos, both of Eiden & O'Donnell, Ltd., of Vernon Hills, for appellant.

Joseph M. Laraia, of Laraia & Hubbard, P.C., of Wheaton, and Douglas E. Zeit, of Law Offices of Douglas E. Zeit, of Waukegan, for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiff, R.J. Management Company, sold defendant, SRLB Development Corporation, a 330-acre parcel of land in Round Lake Beach for residential development. The sales contract provided that

SRLB would pay R.J. Management an additional sum if the development project met its projected profit level. After SRLB failed to pay the additional compensation, R.J. Management brought a cause of action for breach of contract. Following a bench trial, the trial court determined that SRLB breached the parties' contract by failing to render a proper accounting. However, the trial court also found that SRLB did not reach its projected profit level and, consequently, did not owe R.J. Management the contingent compensation. R.J. Management now appeals, asserting that the trial court misjudged the nature of the relationship between R.J. Management and SRLB, and erred on two evidentiary matters. In addition, both parties appeal the trial court's decision not to award attorney fees. We affirm.

The following facts are pertinent to the resolution of this matter. The parties entered into the real estate sales contract on September 7, 1990. SRLB purchased the vacant land for $5 million. Over a period of approximately 10 years, SRLB built and sold 900 single-family homes. The particular contract provision at issue in this case states:

> "Purchaser anticipates that completion of Purchaser's Development Plan will result in Purchaser realizing a profit on the Property as set forth in the *pro forma* attached hereto and made a part hereof as Exhibit B. At such time as Purchaser's Development Plan is completed and the last subdivided unit on the property has been sold, Purchaser shall do an accounting to determine its actual profits on the Property. In the event the accounting determines that actual profits to be made on the property is [*sic*] equal to or greater than two-thirds (2/3) of the total *pro forma* net income set forth on Exhibit B hereto, Purchaser shall pay Seller an additional sum of Two Hundred Fifty Thousand Dollars ($250,000.00) in immediately available funds."

SRLB's *pro forma* income statement forecasted a profit of $16,893,000. Thus, if the project produced a profit of $11,262,000 (two-thirds of $16,893,000) or greater, R.J. Management stood to receive additional compensation of $250,000. However, R.J. Management never received this additional compensation as SRLB asserted that the project fell short of the goal, producing profits in the range of $8 million. R.J. Management maintains that SRLB's $8 million profit figure is unsubstantiated because, over the life of the project, SRLB discarded most of the accounting source documents. Source documents are documents such as invoices and receipts that provide evidence that a transaction has occurred. Thus, R.J. Management contends that it was impossible for SRLB to render a proper accounting as called for under the contract.

At trial, testimony came from R.J. Management's owner, SRLB

executives, and two opposing experts. Mainly, the testimony focused on the information sources used to perform the accounting and the propriety of the expenses included in the calculation of net income.

Rodney Johnson testified that he was the sole owner of R.J. Management. Johnson is an attorney who deals largely in the acquisition, sale, and development of real estate. He negotiated the real estate sales contract with SRLB. According to Johnson, the parties never intended for the project to be a joint venture.

The SRLB executives who testified included Maurice Sanderman. Sanderman is the principal owner of Sundance Homes, SRLB's parent company. In addition, the current and two former chief financial officers (CFOs) testified at trial.

In 1999, a portion of Sundance's business was sold to Centex Homes. During the process, many financial records were destroyed. This meant that SRLB could not produce many of the financial records that R.J. Management requested in discovery. The missing items included such things as ledgers, invoices, and canceled checks. Given that the limitations period for a federal tax audit is three years, SRLB prematurely destroyed many of the financial records from the later years of the project.

After R.J. Management filed suit, Joseph Atkins, CFO from 1997 through 1999, performed a financial analysis of the development project. The home sales had taken place between the years 1992 and 1999. Atkins used financial statements from 1992 and 1993 and SRLB's tax returns for the years 1994 through 1999 to complete the financial analysis.

Dan O'Brien was CFO from 1990 to 1996. He established Sundance's accounting system. From the source documents, monthly income statements were prepared, eventually resulting in a compilation of year-end financial statements. The tax returns were then prepared using this information. According to O'Brien, the information contained in the tax returns represented SRLB's actual performance.

Gary Finigan served as Sundance's comptroller from 1997 through the end of the development project and as CFO after Atkins. Finigan verified that the information contained in the tax returns from 1997 to 2000 accurately reflected SRLB's financial performance.

The trial court initially admitted the tax returns as business records. However, it later reconsidered the issue and refused to admit the tax returns. The trial court decided that the tax returns reflected summary information and that the requisite underlying support documents were unavailable.

Atkins used the available financial statements and tax returns to

prepare an accounting of the profits from the development project. He concluded that the entire project produced a profit of $8,719,022. Obviously, this figure was well below the $11,262,000 profit threshold required to trigger the contingent compensation clause. SRLB also retained Bruce Richman, an accounting expert, to perform an accounting. Richman used the tax returns filed during the years of the project and the remaining financial records to conclude that the project earned $8,792,000. Soon thereafter, Finigan replaced Atkins as CFO. Finigan performed his own review and determined that the profit on the project was $7,963,093. Finigan said that his figure was lower than either Atkins's or Richman's profit figure because he made corrections to the management fee that was charged to the project. A management fee is a method of allocating overhead and pooled costs from a parent company to its subsidiaries. Generally, the costs included in a management fee cannot be attributed to any particular "profit driver," a specific profit-producing activity. In a typical company, the management fee may include utility costs, insurance, and centralized functions like the accounting and legal departments. According to Finigan, the original management fee charged to the project was too low.

Sundance used the same accounting methods to assign costs to each of its projects. Sanderman, O'Brien, Atkins, and Finigan all testified that there was no double billing of expenses. Specifically, this means that direct expenses (expenses directly attributable to a specific profit driver) and expenses assigned through the application of the management fee were distinct and separate, and any identifiable cost was expensed only once. The management fee included costs of functions such as marketing, personnel, and accounting. Sundance assigned the management fee based on the percentage of gross sales attributable to the subsidiary. According to Sanderman, assigning the management fee based on the percentage of sales was the most accurate way to match expenses with the revenues produced by Sundance's subsidiaries. Finigan testified that he examined the management fees assigned to all Sundance subsidiaries during the 10 years of the SRLB development project. He determined that, if anything, the management fee assigned by Sundance to each of the subsidiaries was too low. However, on the whole, Finigan believed that the management fees were fair and accurate. The total amount of the management fee charged to SRLB was approximately $7 million, matched against gross sales of approximately $121 million.

Two expert accountants testified at trial. Jack Ehrlich testified on behalf of R.J. Management. Ehrlich reviewed all of the documents SRLB produced as well as the accountings produced by Atkins and Finigan. He also reviewed the accounting rendered by SRLB's expert, Bruce Richman.

According to Ehrlich, SRLB did not render a proper accounting. He believed that, because so many of the original source documents had been discarded, SRLB could not perform an accounting as called for under the real estate sales contract. Ehrlich also opined that Sundance's allocation method for the management fee violated Cost Accounting Standard 403 (CAS 403). Under CAS 403, costs must have a causative or beneficial connection to a project. Ehrlich criticized SRLB for not properly matching the costs represented by the management fee with the revenue produced by the development project.

Ehrlich refused to render any opinion on the profitability of the development project. He did not believe that it was appropriate to rely on the tax returns to determine profitability. He pointed out that there are differences between financial net income and taxable income. Also, because many source documents were missing, he believed that it was impossible to have confidence that the figures were correct.

In contrast to Ehrlich's position, Richman opined that R.J. Management did not qualify to receive the additional $250,000. Based on a review of available financial statements and tax returns, Richman said that it was clear that SRLB's profitability did not come close to meeting the profit threshold required to qualify for the bonus. Richman concluded that the development project produced a profit of $8,792,853. He stated that it was "quite sufficient" to use tax returns to determine if the contract contingency occurred because the formula for triggering the bonus compensation was simple and straightforward. Contrary to Ehrlich, he believed that it was unnecessary to have the source documents to conduct an accounting. In his view, the tax returns are all a person would need to complete the accounting. He pointed out that the tax returns summarize all of the basic financial information, and that a schedule in each tax return reconciles financial income with taxable income. Furthermore, Richman possessed confidence that the tax return figures were correct, even in the absence of the source documents, because they were derived from SRLB's accounting records. Each year, the CFO or comptroller, namely O'Brien, Atkins, or Finigan, verified the records.

According to Richman, it is very typical for companies to use a management fee to spread out overhead costs. In fact, Richman agreed with Finigan that SRLB's share of the management fee was understated. He believed that it was appropriate and common for companies like Sundance to allocate a management fee based on a subsidiary's percentage of company sales.

Because the tax returns contained a single line item for the management fee, Finigan provided Richman with an itemized account of the expenses comprising the management fee. The information

Finigan supplied, Richman said, was reasonably and ordinarily relied upon in the accounting industry to determine a subsidiary's allocable expenses. Under the most generous estimate of the development project's profitability, the project still did not come close to reaching the requisite profit threshold, Richman said.

In the end, the trial court found that SRLB failed to render an accounting as required under the real estate sales contract. The trial court stated that an accounting required the availability of source documents or at least the documents that originally summarized the source documents. Thus, with knowledge that an accounting was due, SRLB discarded its source documents. Consequently, the trial court determined that it was required to draw all reasonable presumptions against SRLB.

Nonetheless, the trial court believed Richman's conclusion that the project did not produce sufficient profits to trigger the contingency clause. The trial court found that the tax returns were sufficiently reliable to support Richman's conclusion. Also, the court determined that Sundance's management fee properly allocated expenses to SRLB that could not otherwise be directly assigned to the development project. Thus, because SRLB did not earn a profit of $11,262,000, it did not owe R.J. Management the $250,000. Finally, the trial court decided not to award attorney fees.

■ R.J. Management's basic argument challenges the sufficiency of the evidence. We will not disturb the trial court's findings unless they are against the manifest weight of the evidence. *People ex rel. Illinois Historic Preservation Agency v. Zych*, 186 Ill. 2d 267, 278 (1999).

■ As an initial matter, SRLB has tucked into its response brief a request for us to review the trial court's decision that SRLB failed to perform an accounting as contemplated in the parties' agreement. On this point, the trial court believed Ehrlich's testimony that a complete accounting as envisioned by the parties required SRLB to maintain the source documents or at least the original summary documents. We conclude that the trial court's finding is not against the manifest weight of the evidence. R.J. Management has filed a motion asking us to strike this argument based on the manner in which SRLB raised it. Because SRLB's argument lacks merit, it is unnecessary to discuss it any further. R.J. Management's motion to strike portions of SRLB's brief is denied.

As the first major issue on appeal, R.J. Management maintains that the trial court failed to apply the adverse presumption arising from SRLB's destruction of its accounting records. Alternatively, R.J. Management asserts that, by misjudging the nature of the relationship between R.J. Management and SRLB, the trial court did not

properly apply the adverse presumption arising from the destruction of the records.

■ Where a party has deliberately destroyed evidence, a trial court will indulge all reasonable presumptions against the party. *Haynes v. Coca Cola Bottling Co. of Chicago*, 39 Ill. App. 3d 39, 46 (1976). One of the presumptions is that the preservation of the evidence would have been prejudicial to the party's case. *Haynes*, 39 Ill. App. 3d at 46. In this case, the adverse presumption required the trial court to presume that SRLB met the threshold income required to trigger the contingent compensation clause. This presumption is not evidence. See *Smith v. Tri-R Vending*, 249 Ill. App. 3d 654, 661 (1993). Instead, it establishes a *prima facie* case as to the issue involved and shifts the burden of producing evidence. *Smith*, 249 Ill. App. 3d at 661. However, it does not shift the ultimate burden of persuasion. *Smith*, 249 Ill. App. 3d at 661.

Under the "Thayer approach" followed in Illinois, when contrary evidence is produced, the metaphorical bubble bursts and the presumption vanishes entirely. *Barnes v. Brown*, 193 Ill. App. 3d 604, 611 (1990). No uniform test exists to dictate how much evidence is necessary to rebut a presumption. *Smith*, 249 Ill. App. 3d at 661. The party contesting the presumption must come forward with sufficient evidence to support a finding of the nonexistence of the presumed fact. *Barnes*, 193 Ill. App. 3d at 611. Occasionally, a party attacking a presumption has a greater burden of production than merely producing evidence sufficient to support a reasonable trier of fact's finding as to the nonexistence of the presumed fact. M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 302.5, at 88 (8th ed. 2004). In these cases, due to compelling considerations of policy, the challenging party must overcome a "strong" presumption by clear and convincing evidence. M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 302.5, at 88 (8th ed. 2004). This "strong" presumption commonly arises where the party challenging the presumption was a fiduciary of the party receiving the favor of the presumption. See, *e.g.*, *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 465 (1983).

In this case, R.J. Management's assertion that the trial court did not consider an adverse presumption is incorrect. After concluding that SRLB willfully destroyed the accounting records, the trial court explained:

> "[T]he Court is required to draw presumptions reasonably and in favor of the plaintiff in its analysis of the remaining issues. However, the law does not provide that the failure of the defendant to provide an accounting as required under its agreement and as a

matter of law in and of itself means that the plaintiff prevails. Its [*sic*] means to the Court's understanding and the Court finds once again that reasonable presumptions ought to be drawn in favor of the plaintiff and against the defendant."

In the end, the court concluded:

"I am convinced by more than a preponderance of the evidence and I, therefore, find that the threshold income figure was not met, even drawing every reasonable inference in favor of the plaintiff. Therefore, judgment is entered for the defendant."

These passages demonstrate that the trial court indulged in the presumption against SRLB that the preservation of the accounting records would have been prejudicial to its interests.

However, R.J. Management also has a grievance with the trial court's application of the presumption. R.J. Management contends that the trial court used the wrong evidentiary standard when it held that SRLB rebutted the adverse presumption by a preponderance of the evidence. It urges that, based on the trust it reposed under the contract in SRLB to account for the project's profitability, a fiduciary relationship existed between R.J. Management and SRLB. Thus, R.J. Management believes that the existence of a fiduciary relationship required SRLB to provide clear and convincing evidence to rebut the adverse presumption.

R.J. Management has failed to provide any cases on point to support its position that SRLB was a fiduciary under these circumstances. It cites, for example, *Franciscan Sisters Health Care Corp.*, 95 Ill. 2d at 465, to advance the idea that one who reposes trust in another should be held to account for its dealings as a fiduciary. However, this general proposition of law does not resolve the issue R.J. Management has raised. We must decide if the present situation involved a fiduciary relationship. A recent California case, *Wolf v. Superior Court*, 107 Cal. App. 4th 25, 130 Cal. Rptr. 2d 860 (2003), addressed the same issue in a factually similar scenario. We will examine the case for guidance.

In *Wolf*, an author entered into a contract with the Walt Disney Corporation in which the author assigned to Disney the rights to his novel and its cast of characters. *Wolf*, 107 Cal. App. 4th at 27-29, 130 Cal. Rptr. 2d at 862-63. In exchange, Disney agreed to pay the author an amount of fixed compensation, a percentage of the net profits from a movie based on the characters, and additional contingent compensation in the amount of 5% of any future proceeds earned from merchandising or exploitation of the characters. *Wolf*, 107 Cal. App. 4th at 28, 130 Cal. Rptr. 2d at 862.

Under the agreement, the author had "audit rights." *Wolf*, 107 Cal. App. 4th at 28, 130 Cal. Rptr. 2d at 862-63. However, each time he

attempted to exercise those rights, Disney refused him access to the pertinent records. *Wolf*, 107 Cal. App. 4th at 28, 130 Cal. Rptr. 2d at 863. Moreover, Disney was accused of under-reporting revenues it received in connection with the characters. *Wolf*, 107 Cal. App. 4th at 28, 130 Cal. Rptr. 2d at 863. The author contended that Disney's conduct not only constituted a breach of contract but also amounted to a breach of fiduciary duty. *Wolf*, 107 Cal. App. 4th at 28-29, 130 Cal. Rptr. 2d at 863. The fiduciary duty claim was based on the fact that Disney retained exclusive control over all of the financial records and information pertaining to the revenue received from the exploitation of the characters. *Wolf*, 107 Cal. App. 4th at 28-29, 130 Cal. Rptr. 2d at 863.

The court held that "the contractual right to contingent compensation in the control of another has never, by itself, been sufficient to create a fiduciary relationship where one would not otherwise exist." *Wolf*, 107 Cal. App. 4th at 30-31, 130 Cal. Rptr. 2d at 864. The court also rejected the author's claim that the fiduciary relationship existed because he "reposed trust and confidence" in Disney to perform its contractual duty to account for and pay the author the contingent compensation agreed upon in the contract. *Wolf*, 107 Cal. App. 4th at 31, 130 Cal. Rptr. 2d at 865. The court noted that every contract requires one party to repose trust and confidence in the other party to perform. *Wolf*, 107 Cal. App. 4th at 31, 130 Cal. Rptr. 2d at 865. Thus, all contracts retain an implied covenant of good faith and fair dealing, obligating parties to refrain from acting in such a way as to destroy or injure the right of the other party to receive the benefit of the contract. *Wolf*, 107 Cal. App. 4th at 31, 130 Cal. Rptr. 2d at 865. Being of universal prevalence, the implied covenant does not create a fiduciary duty. *Wolf*, 107 Cal. App. 4th at 31, 130 Cal. Rptr. 2d at 865. It allows redress only for breach of contract. *Wolf*, 107 Cal. App. 4th at 31, 130 Cal. Rptr. 2d at 865.

The court also rebuffed the author's claim that the profit-sharing aspect of the agreement gave rise to a fiduciary relationship. *Wolf*, 107 Cal. App. 4th at 31-32, 130 Cal. Rptr. 2d at 865. The court explained that the relationship between the author and Disney was not a joint venture or enterprise. *Wolf*, 107 Cal. App. 4th at 32-33, 130 Cal. Rptr. 2d at 866. Rather, it was more akin to a debtor/creditor relationship. *Wolf*, 107 Cal. App. 4th at 32-33, 130 Cal. Rptr. 2d at 866. Disney was not obligated to maximize profits or obtain the author's permission to enter into third-party contracts. *Wolf*, 107 Cal. App. 4th at 32-33, 130 Cal. Rptr. 2d at 866.

The court next considered whether the author's right to an accounting created a fiduciary relationship. *Wolf*, 107 Cal. App. 4th at

33, 130 Cal. Rptr. 2d at 867. On this point, the court stated that a relationship is fiduciary or it is not. *Wolf*, 107 Cal. App. 4th at 34, 130 Cal. Rptr. 2d at 867. The existence of a fiduciary relationship is governed by the nature of the relationship, not by the remedy sought. *Wolf*, 107 Cal. App. 4th at 34, 130 Cal. Rptr. 2d at 867. Absent a fiduciary relationship, a party to a profit-sharing agreement may still have a right to an accounting when that right is found in the parties' agreement. *Wolf*, 107 Cal. App. 4th at 34, 130 Cal. Rptr. 2d at 867. Even if the remedy is not expressly set forth in a contract, the right to an accounting may be derived, not just from a fiduciary relationship, but from the implied covenant of good faith and fair dealing inherent in every contract. *Wolf*, 107 Cal. App. 4th at 34, 130 Cal. Rptr. 2d at 867. Thus, the contractual right to an accounting does not itself transform an arm's-length transaction into a fiduciary relationship. *Wolf*, 107 Cal. App. 4th at 35, 130 Cal. Rptr. 2d at 868.

Finally, the court considered whether shifting the burden of proof to a party in control of financial records creates a fiduciary relationship. *Wolf*, 107 Cal. App. 4th at 35, 130 Cal. Rptr. 2d at 868. The court held that the practical considerations of shifting a burden of proof to one in exclusive control of records and documents cannot serve to create a fiduciary relationship where one does not otherwise exist. *Wolf*, 107 Cal. App. 4th at 36, 130 Cal. Rptr. 2d at 869.

■ Illinois law contains the same basic principles that the court in *Wolf* used to advance its analysis. For instance, the mere fact that business transactions occurred or that a contractual relationship existed is insufficient to warrant finding a fiduciary relationship. *State Security Insurance Co. v. Frank Hall & Co.*, 258 Ill. App. 3d 588, 597 (1994). "Generally, where parties capable of handling their business affairs deal with each other at arm's length, and there is no evidence that the alleged fiduciary agreed to exercise its judgment on behalf of the alleged servient party, no fiduciary relationship will be deemed to exist." *State Security Insurance Co.*, 258 Ill. App. 3d at 597-98. Here, like in *Wolf*, the parties were neither partners nor engaged in a joint venture. SRLB was not bound to exercise its judgment on behalf of R.J. Management. The parties simply had a contract providing for contingent compensation triggered by the project meeting the income threshold. The relationship was more akin to a debtor/creditor relationship. See *In re K Town, Inc.*, 171 B.R. 313, 320 (Bankr. N.D. Ill. 1994) (stating that, while a lender is not typically a fiduciary of its borrower, the lender may be deemed a fiduciary by exercising control sufficient to dictate corporate policy and the disposition of assets). The duty of good faith and fair dealing required SRLB to refrain from doing anything to destroy or injure R.J. Management's right to receive

the benefit of the contract. See *Prudential Insurance Co. of America v. Van Matre*, 158 Ill. App. 3d 298, 308 (1987). Nevertheless, we conclude that SRLB did not have a fiduciary relationship with R.J. Management.

■ Having concluded that no fiduciary relationship existed between SRLB and R.J. Management, we reject R.J. Management's argument that SRLB was required to rebut by clear and convincing evidence the adverse presumption arising from the destroyed accounting records. Rather, the trial court properly examined the evidence and determined that SRLB came forward with sufficient evidence to support a finding of the nonexistence of the presumed fact.

■ On a related note, R.J. Management requests that we find that the trial court erred when it refused to allow R.J. Management the chance to amend its complaint and add a claim of breach of fiduciary duty. The decision to permit an amendment of a complaint is a matter within the sound discretion of the trial court, and we will not disturb the trial court's decision on review absent an abuse of that discretion. See *Village of Wadsworth v. Kerton*, 311 Ill. App. 3d 829, 842 (2000). Given that the trial court correctly decided that SRLB was not a fiduciary, the trial court did not abuse its discretion by refusing to allow an amendment to R.J. Management's complaint.

As the next issue, R.J. Management raises two more evidentiary matters. First, it contends that Richman could not rely upon the tax returns to render an opinion about the project's profitability. R.J. Management argues that the tax returns are unreliable and hearsay and, thus, could not justifiably support Richman's opinion that the development project did not reach the threshold income level.

■ An expert may give opinion testimony based upon information that has not been admitted into evidence, as long as the facts relied upon are sufficiently reliable. *Kurrack v. American District Telegraph Co.*, 252 Ill. App. 3d 885, 897 (1993). In examining the reliability of the underlying data, the trial court may, at its discretion, consider whether the underlying facts or data that formed the basis of the expert's opinion are of the type reasonably relied upon by experts in the particular field. *Kurrack*, 252 Ill. App. 3d at 897. Thus, there must be a foundation for the evidence sufficient to establish that the information upon which the expert bases his opinion is reliable. *Turner v. Williams*, 326 Ill. App. 3d 541, 553 (2001). We will not disturb the trial court's determination on this matter absent an abuse of its discretion. See *Kurrack*, 252 Ill. App. 3d at 897.

■ Furthermore, expert testimony is often based upon hearsay evidence. *Montefusco v. Cecon Construction Co.*, 74 Ill. App. 3d 319, 322-23 (1979). When the hearsay evidence is customarily relied upon

by experts in the field, the opinion is admissible. *Montefusco*, 74 Ill. App. 3d at 322-23.

■ In its ruling, the trial court found that the tax returns were reasonably and sufficiently reliable to form the basis of Richman's opinion that the development project did not reach the threshold income. The trial court pointed out that Richman testified that the tax returns were reliable under the circumstances and that tax returns are customarily used in the industry for determining profit. The trial court also considered the testimony of Sanderman, Finigan, and O'Brien in regard to the method and manner of making the original journal entries and the supervision of the overall accounting process. For instance, the trial court observed that the SRLB executives held monthly review meetings and compared the tax returns on a line-by-line basis with the trial balances before filing.

We think that the trial court reasonably accepted Richman's conclusion that tax returns are customarily used to measure profit. In addition, the testimony of the SRLB executives provided sufficient assurance that the information contained in the tax returns reflected the information captured by SRLB's accounting system. Moreover, even if the tax returns constituted hearsay, given that tax returns are customarily relied upon by experts in the field, Richman's opinion is admissible. Thus, we find that the trial court did not abuse its discretion on this matter.

Incidentally, SRLB requests that we determine that the tax returns themselves were admissible evidence. We decline to consider SRLB's argument. See *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 386 (1983) (stating that a party cannot complain of error which does not prejudicially affect it).

■ R.J. Management's second grievance with an evidentiary ruling involves Sundance's allocation of the management fee to SRLB. Essentially, R.J. Management maintains that the trial court erred by ruling that the management fee was properly included in the calculation of SRLB's profitability.

The trial court found that the management fee allocated by Sundance to SRLB, Sundance's subsidiary, based on the percentage of gross sales attributable to SRLB, was an appropriate allocation of expenses that could not be directly assigned. The trial court recognized that, under CAS 403, expenses cannot be allocated as an amorphous mass over a single allocation base. However, SRLB did not allocate its expenses in such an undisciplined way, the trial court explained. Rather, in the trial court's view, based on the testimony of Sanderman and Richman, it was very typical in the real estate industry for a parent company to allocate some expenses via a management fee

calculated on the basis of the percentage of gross sales attributable to the subsidiary. Thus, given the circumstances, the trial court determined that Sundance's allocation method was reasonable. More important, it determined that SRLB properly included the management fee in the calculation of net income.

Based on our review of the record and the trial court's ruling, we find that the trial court's finding was not against the manifest weight of the evidence. SRLB's allocation method and the specific allocations were reasonable.

Furthermore, we reject R.J. Management's contention that the deduction of a management fee was not contemplated under the parties' agreement. This argument is flawed because it assumes that only direct costs, like construction materials, contribute to the creation of profit. It misses the point that the costs included in the management fee, such as marketing and accounting expenses, are also essential to the creation of profit. For this reason, the costs are properly matched against revenue in the form of a management fee. Thus, R.J. Management's argument is without merit.

In sum, based on our review of the record, the trial court's findings in this matter are not against the manifest weight of the evidence and its conclusions are reasonable. We find no grounds to warrant reversing the trial court.

As a final issue, both R.J. Management and SRLB appeal the trial court's refusal to award attorney fees to either party under a contract provision granting attorney fees to a prevailing party in a dispute. The trial court based its decision on the fact that R.J. Management did not prove any damages, and that SRLB breached the contract by not providing a sufficient accounting. In the court's view, both R.J. Management and SRLB prevailed on a significant issue.

Whether and in what amount to award attorney fees is within the discretion of the trial court, and the decision will not be disturbed on appeal absent an abuse of that discretion. *Med+Plus Neck & Back Pain Center v. Noffsinger*, 311 Ill. App. 3d 853, 861 (2000). In *Med+Plus*, we dealt with a situation similar to this one. There, the plaintiff received a judgment that the defendant breached an employment contract. *Med+Plus*, 311 Ill. App. 3d at 861. At the same time, the defendant succeeded on the plaintiff's damages claims because a liquidated damages clause was held unenforceable, and the plaintiff did not prove any actual damages. *Med+Plus*, 311 Ill. App. 3d at 861. We stated that a party can be considered to be a "prevailing party" for purposes of a fee-shifting provision when it is successful on any significant issue in the case and achieves some benefit. *Med+Plus*, 311 Ill. App. 3d at 861. Thus, we held that the trial court's decision not to

award attorney fees was not an abuse of discretion, as both parties were successful on significant issues. *Med+Plus,* 311 Ill. App. 3d at 861.

Likewise here, each party prevailed on a significant issue. The trial court agreed with R.J. Management that SRLB breached the contract by not providing an adequate accounting. However, the trial court also agreed with SRLB that R.J. Management failed to establish any damages. We conclude that the trial court's decision not to award attorney fees was not an abuse of discretion.

For the aforementioned reasons, we affirm the judgment of the circuit court of Lake County.

Affirmed.

McLAREN and GILLERAN JOHNSON, JJ., concur.