(No. 43714.—

ILG Industries, Inc., Appellee, *vs.* Robert P. Scott *et al.*, Appellants.

*Opinion filed June 24, 1971.—Rehearing denied October 4, 1971.*

David F. Holland, of Chicago, for appellants.

Francis A. Even and Donald W. Carlin, both of Chicago, for appellee.

Mr. Justice Davis delivered the opinion of the court:

The plaintiff brought this suit in the circuit court of Cook County for an injunction prohibiting the defendants from using and enjoying the benefits of certain alleged trade secrets. The trial court found that two particular drawings containing certain dimensional information and specifications regarding fan blades and retaining rings, which were integral parts of the plaintiff's industrial fans, were trade secrets. The court enjoined the defendants from using these drawings, and from selling any industrial fans built on information derived from the plaintiff's fans, for a period of 18 months from July 31, 1969.

The defendants appealed (43 Ill.2d R. 302(a)(2)), contending essentially that the findings of the trial court—that the two drawings contained trade secrets—were contrary to the manifest weight of the evidence; that it was error to enjoin the sale of the complete fans for a specified period when only the drawings of a component part thereof were found to be trade secrets; and that, since the fans and their components were not patented, the injunction barring the defendants from selling products built from the information derived from the plaintiff's fans violated the patent and supremacy clauses of the United States constitution, as well as its fourteenth amendment, and sections 1 and 2 of article II of the Illinois constitution.

The plaintiff cross-appealed and contends that the prohibition against selling the particular fans, for the limited period of only 18 months, was error, and that the rule laid down by this court in *Schulenburg v. Signatrol, Inc.,* 33 Ill.2d 379, as to the time limitation of injunctions in this type of case, should be overruled.

The defendant, Robert P. Scott, had been employed by the General Blower Company since about 1945, and had been advanced to the position of vice-president and general manager. The company manufactured industrial fans. The plaintiff acquired this company in 1959 as a subsidiary, and ultimately it was operated and known as the General Blower Division of the plaintiff company. Scott was retained as an employee and, at the termination of his employment on December 31, 1969, was vice-president and director of the plaintiff company, a member of the executive committee of its directors, and the general manager of the General Blower Division.

The plaintiff manufactures heavy-duty centrifugal blowers—a type of industrial fan. Some are used for moving clean air; others are used for moving materials such as grain and sawdust. Within the housing of these fans are a series of blades which are welded at their back edges to a circular back plate, and at their front edges to a retaining ring. The blades surround a central hub. The retaining rings are a cone-shaped piece of metal with a central opening called an "eye". The fans are built in a variety of sizes.

The drawings, which were taken by the defendant Scott when his employment was terminated, were found by the trial court to be trade secrets. They show the configuration of the retaining rings, the blades of a particular wheel, and the dimensions and materials for most of the size ranges. The design of these wheels, which are the central part of the fan, was developed in 1956 and 1957, over a period of some 18 months, by a consulting engineer. Subsequently, a number of changes were made, not in the design, but in the

thickness of metal parts and the alloys used. These changes were necessitated by failures and breakage of the wheels in actual use.

When the defendant Scott left the employ of the plaintiff, he contacted the Iowa Manufacturing Company, which, at that time, was the plaintiff's largest customer for industrial fans. A representative of this company told Scott that he also could supply fans to the company provided the fans which he furnished were directly substitutable with the plaintiff's, and provided the fan wheels could be satisfactorily and interchangeably used in the housing of the plaintiff's fans.

Scott then contacted Metal Spinners, Inc., which manufactured the retaining rings for the plaintiff's fans. Metal Spinners declined to produce these rings from the special toolings and designs which they held for the use of the plaintiff. Scott then gave a drawing to Metal Spinners containing the desired design and specifications, which drawing contained data copied by Scott from one of the drawings claimed by the plaintiff to be a trade secret. This was one of the drawings taken by Scott when he left his employment with the plaintiff.

The defendants presented evidence that the fans of the plaintiff could be measured, and that through the application of certain mathematical formulae, the approximate dimensions of the parts could be determined. Evidence was also presented that such dimensions could be calculated from information contained in the plaintiff's catalog, although it was conceded that this would not yield a result which would be as accurate as that obtained from actual measurements.

The plaintiff's witnesses testified that because of the weld and variance from specifications resulting in the manufacture of the fans, the content of the two drawings could not be reconstructed by the measurements of the fans except by a statistical examination of many wheels of each size. The plaintiff's vice-president of engineering stated

that such a statistical analysis might lead to a reproduction of the plaintiff's fans in a period of about 18 months.

The defendants also presented evidence that drawings of the type here in question, or information contained therein, were given to certain customers, such as Iowa Manufacturing Company. Francis L. Moore, a former chief engineer under Scott, testified that it was understood the drawings were confidential and that the information could be given out only with Scott's approval. Apparently, however, the drawings in the possession of certain customers were used to incorporate the fans into their products, and these drawings did not disclose all specifications and configurations.

The initial question for determination is whether the drawings utilized by the defendants were, or contained, trade secrets. The defendants claim that the fact that the information in the drawings could be ascertained through reverse engineering by measurements made on the finished product, and that disclosure of certain of this information had been made to customers, caused these drawings not to be trade secrets.

Trade secrets may cover a wide spectrum of categories. A definition of the possible objects of trade secrecy is undoubtedly subject to variations and change as the facts of any particular case might dictate. Generally, a trade secret is described as a plan or process, tool, mechanism, compound, or informational data utilized by a person in his business operations and known only to him and such limited other persons to whom it may be necessary to confide it. *Schulenburg* v. *Signatrol, Inc.,* 33 Ill.2d 379, 385; *Victor Chemical Works* v. *Iliff,* 299 Ill. 532, 545, 546.

Obviously, a trade secret must relate to something held in secret or confidence, and it must relate to the operation of the particular trade or business. (*Schulenburg* v. *Signatrol, Inc.,* 33 Ill.2d 379, 385; *Victor Chemical Works* v. *Iliff,* 299 Ill. 532, 545, 546; *Revcor, Inc.* v. *Fame, Inc.,* 85

Ill. App. 2d 350, 355.) That which is of general knowledge within an industry cannot be a trade secret; something which is fully and completely disclosed by a business through its catalogs or literature disseminated throughout an industry cannot be a trade secret (*Victor Chemical Works* v. *Iliff*, 299 Ill. 532, 545, 546; *Bimba Mfg. Co.* v. *Starz Cylinder Co.*, 119 Ill. App. 2d 251, 263, 264); nor can matters which are readily and completely disclosed by the product itself constitute a trade secret. *Cook-Master, Inc.* v. *Nicro Steel Products, Inc.*, 339 Ill. App. 519, 534.

As stated in the Restatement of Torts, an exact definition of a trade secret, applicable to all situations, is not possible. "Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Restatement of Torts, § 757, comment b, p. 6.

Conflicting social and economic policy considerations are present in each trade secret case. A business which may invest substantial time, money and manpower to develop secret advantages over its competitors, must be afforded protection against the wrongful appropriation of confidential information by a prior employee, who was in a position of confidence and trust. At the same time, the right of an individual to follow and pursue the particular occupation for which he is best trained is a most fundamental right. Our society is extremely mobile and our free economy is based upon competition. One who has worked in a particular field cannot be compelled to erase from his mind all

of the general skills, knowledge and expertise acquired through his experience. These skills are valuable to such employee in the market place for his services. Restraints cannot be lightly placed upon his right to compete in the area of his greatest worth.

While we do not lightly find the presence of a trade secret, we believe the trial court was correct in its findings in this case, and that such findings are supported by the evidence. The argument that the component parts of the fans on the open market could be measured and the information contained in the drawings ascertained, through reverse engineering or some such similar process, has been rejected, particularly where such a process is relatively time-consuming and expensive as compared with the utilization of a drawing or specification. *Schulenburg* v. *Signatrol, Inc.,* 33 Ill.2d 379, 386, 387; *Revcor, Inc.* v. *Fame, Inc.,* 85 Ill. App. 2d 350, 356.

The evidence was conflicting as to whether the plaintiff considered the particular drawings and the information therein contained as secret and confidential. The disclosure of this information, or a part thereof, to a customer, or a supplier of a component part, where necessary for a business purpose, does not in all cases destroy the confidential or secret nature thereof. There was evidence that not all of the critical information was supplied. There was also evidence that the recipients thereof understood that the information they received was to be treated in confidence. Indeed, it was the supplier of one of the plaintiff's component parts that refused to divulge information to the defendants and informed the plaintiff of the apparent use of its drawings by the defendants.

Apparently, some of the dimensions used by the plaintiff in its fans were standard throughout the industry. Others, however, were not, and were unique to the plaintiff. There was testimony concerning the difficulty in obtaining accurate measurements from the blowers and the

fans made by the plaintiff. There was evidence that it would require the examination of a large number of fans of each size to accurately ascertain the dimensions in question. This procedure obviously would have been time-consuming and expensive even if a sufficient number of the plaintiff's fans had been available to the defendants for examination.

In all, there was sufficient evidence to support the trial court's finding that the two particular drawings containing the information and specifications in question were trade secrets and the findings in this regard must be affirmed. *Brown* v. *Commercial National Bank*, 42 Ill.2d 365, 371.

The trial court enjoined not only the use of the particular drawings it found to be trade secrets, but also, for a period of 18 months from July 31, 1969, it enjoined the defendants from delivering, or permitting the use, by sale or otherwise, of any fan or any component thereof which was built on information derived from any of the plaintiff's fans depicted in the two drawings. During this period, there was no prohibition against the defendants acquiring information about the plaintiff's fans through measurements and computations independent of the drawings.

We believe that the trial court was correct in extending the terms of the injunction to encompass the entire fan, and not merely the component parts to which the drawings referred. It seems illusory to suggest that anything less would have been adequate to protect the plaintiff. The particular components have utility only when incorporated in a fan. It would have been of no consequence to bar only the sale of component parts as such, or to bar the sale of fans only so long as they admittedly were built solely from information contained in the drawings. From a practical viewpoint, it would be most difficult to enforce an injunction restraining the delivery of any component part of the fan built from information derived from the two drawings, and it would likewise be an insurmountable task to determine whether the information utilized in the construction of the

fans came from the drawings or from independent measurements.

The defendants admittedly chose to use the drawings that the defendant Scott had taken. These drawings, still in his possession, have not been returned to the plaintiff pursuant to court order. The evidence is not without conflict as to the length of time, as well as the expense, which might have been involved had the defendant attempted to copy the plaintiff's fans without the use of the drawings. It might even be questioned whether the defendants could have copied them in sufficient detail. The Iowa Manufacturing Company indicated that it would purchase from the defendants only if their products were fully substitutable with the plaintiff's, even to the extent of using the defendants' fan wheels in the housing of the plaintiff's fans.

The 18-month period adopted by the court for the duration of its injunction apparently was based upon the testimony of the plaintiff's vice-president of engineering—that statistical analysis made from measurements might result in a duplication of the plaintiff's fans within a period of 18 months, assuming a sufficient number of fans were available for measurements. This testimony furnished an evidentiary basis for the court's findings, and, along with other proof set forth in the record, adequately supported the time period selected by the court. (See: *Heatbath Corp.* v. *Ifkovits*, 117 Ill. App. 2d 158, 167.) The defendants elected to proceed in an unlawful manner although a legal means of obtaining this information apparently was available to them. Under the circumstances of this case, the duration of the prohibition imposed by the court was not unreasonable.

The defendants urge that under the rationale of *Sears, Roebuck & Co.* v. *Stiffel Co.*, 376 U.S. 225, 11 L. Ed. 2d 661, 84 S. Ct. 784 and *Compco Corp.* v. *Day-Bright Lighting, Inc.*, 376 U.S. 234, 11 L. Ed. 2d 669, 84 S. Ct. 779, it is improper to prohibit the sale of fans, which themselves

are not trade secrets. However, the component parts which make up the fan involve trade secrets, and as we have indicated, in order to protect the trade secrets under the facts of this case, it was necessary to make the prohibition applicable to the completed product. The identical issue was raised and rejected in *Schulenburg*, which involved flashers which were not, themselves, trade secrets. The *Sears* and *Compco* cases did not in any way involve trade secrets and the surreptitious copying of these by a prior employee.

The plaintiff urges that we depart from the rationale of *Schulenburg*, and points out that the theft of documents which reflect or record secret information is a violation of a criminal statute. (Ill. Rev. Stat. 1969, ch. 38, par. 15—1 *et seq.*) It also contends that since there has been a theft of property, the defendants should not be permitted to deprive the plaintiff of that property and after 18 months competitively use the fruits of the theft.

We believe that *Schulenburg* recognizes the economic reality that trade secrets can often be discovered by lawful means. By making use and analysis of literature available and of the information ascertainable from the products themselves, a trade secret may be discoverable by reverse engineering. In many cases the question of whether a specific matter is a trade secret is an extremely close one, often not readily predictable until a court has announced its ruling. At the same time, the countervailing social and economic policy considerations relative to a person's right to pursue employment in a field in which he has expertise and knowledge cannot totally be cast aside.

What in reality is protected in cases of this nature is not the product or process, but the secrecy of it. (*Jones* v. *Ulrich*, 342 Ill. App. 16, 30-32.) Contrary to the plaintiff's assertion, we believe commercial morality is preserved by preventing one from wrongfully using secret information for a period of time no longer than that required to discover or reproduce that information by lawful means. Where

that period can be ascertained, the defendant should be put out of business only for that length of time and, thus, be prevented from obtaining any advantage by the wrongful use of trade secrets. *Schulenburg* v. *Signatrol, Inc.*, 33 Ill.2d 379, 387, 388.

We believe *Schulenburg* is controlling and that the philosophy expressed therein is sound and should be followed. Accordingly, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*