LIEBERT CORPORATION *et al.*, Plaintiffs-Appellants, v. JOHN MAZUR, an Indiv., *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—04—2794

Opinion filed April 5, 2005.—Rehearing denied March 24, 2005, and March 31, 2005.

HALL, J., dissenting.

Joseph R. Marconi, Kathryn R. Hoying, David M. Macksey, and Garrett L. Boehm, Jr., all of Johnson & Bell, Ltd., of Chicago, for appellants.

Barry Levenstam, Terrence J. Truax, and Derek S. Witte, all of Jenner & Block, L.L.P., of Chicago, for appellee American Power Conversion Corporation.

Paige C. Donaldson and Neal B. McQueeney, both of Sanchez & Daniels, of Chicago, for other appellees.

JUSTICE WOLFSON delivered the opinion of the court:

Plaintiffs Liebert Corporation (Liebert) and Zonatherm Products, Incorporated (Zonatherm), sought to enjoin several of Zonatherm's former employees from using alleged trade secrets in their new competing business, Aerico, Incorporated (Aerico). Plaintiffs alleged defendants misappropriated confidential customer lists, historical bids, quotations, sales history, and price books. The trial court denied plaintiffs' motion for a preliminary injunction. Plaintiffs appeal. We affirm in part, reverse in part, and reverse and remand in part.

FACTS

I. History of the Parties

Liebert is an Ohio corporation engaged in the manufacture and sale of computer network protection equipment that provides uninterrupted network power and climate control technologies. Ninety percent of Liebert's sales consist of engineered or applied systems for uninterrupted power or network air-conditioning systems.

Zonatherm is an Illinois corporation that, among other things, sells products manufactured by Liebert. Zonatherm has been the exclusive Liebert representative in the Chicago area since it was founded in 1969. On October 1, 2003, Liebert and Zonatherm entered into a representative agreement providing for the confidential treatment of Liebert's confidential, proprietary, and trade secret information, with restrictions on disclosure, use, and dissemination.

Defendants John Mazur (Mazur), Gregory N. Schwabe (Schwabe), Jerome Mazur (Jerome), and Mario Belluomini (Belluomini) are

former Zonatherm employees and sales representatives for Liebert. Mazur was a territory sales manager for Zonatherm and was responsible for 25% of Zonatherm's sales of Liebert's products. Mazur and Schwabe resigned from Zonatherm on January 20, 2004, and began to work at Aerico on January 22, 2004. Belluomini and Jerome resigned from Zonatherm and began work at Aerico on January 26 and 30, 2004, respectively. Defendant Laurence Bergfalk (Bergfalk) became a shareholder in Aerico along with Mazur and Schwabe.

Aerico is in the business of marketing and selling products manufactured by American Power Conversion Corporation (APC), a direct competitor of plaintiffs. Mazur and Schwabe incorporated Aerico on November 12, 2003—two months before they resigned from Zonatherm—and signed a representative agreement with APC on January 19, 2004. APC, a Massachusetts corporation, designs products similar to Liebert's and is one of Liebert's direct competitors.

II. Plaintiffs' Alleged Trade Secrets

The information defendants allegedly misappropriated was stored electronically and could be accessed through two e-commerce websites maintained by Liebert.

*A. Liebert's and Zonatherm's Electronic Storage of the Alleged Trade Secrets*

Philip Jan Barnett, Liebert's director of e-commerce, testified regarding the confidential information and how it was stored. Through the "var.liebert.net" website, Liebert's approximately 800 value-added resellers could access his or her own electronic work area with price quotes, pricing level, and products information. Each of the 72 offices within Liebert's domestic organization had its own virtual space to store and view customer information, quotations, orders, and other information.

The second website, "rep.liebert.com" (El.net), also known as El-.Net or the Electronic Liebert Network, was a "virtual office" for first-channel salespeople, sales representatives, international distributors, and factory direct offices. The El.net site housed confidential customer lists, quote lists, pricing information, customer accounts receivable, order acknowledgments, and shipment information. All of the information was confidential to each exclusive representative office, like Zonatherm, and each representative was assigned a particular sales territory.

Barnett described the organization of the El.net website: (1) the quote and order section, which shows the salesperson's personal quotes and orders as well as those of the sales office; (2) the competition sec-

tion showing information on the strengths and weaknesses of the competition and what to do in direct bid situations; (3) the lead time reports showing what inventory is available in the factories and warehouses; (4) the price books; (5) the reconditioned equipment and surplus equipment sections; (6) the sales information section containing highly confidential customer information; (7) the sales reporting wizard, which inputs sales information into a spreadsheet; (8) the sales development area; (9) sales application tools; (10) leasing information; (11) a freight calculator; (12) industrial tools; (13) sales presentations; and (14) sales quotation information.

*B. The Types of Information Allegedly Misappropriated*
    Three of the above-listed items are at issue in this case—customer information, sales quotation information, and the price books.

1. Customer contact lists
    Zonatherm's customer list included company names, phone numbers, addresses, customers' e-mail addresses, and the names, telephone numbers, and addresses of individual contacts within each company. Zonatherm maintained separate lists for each sales territory. The sales team assigned to a particular territory would have access to that territory's customer list on Zonatherm's server. Salespersons were not given access to other territories' customer lists. According to Stephen Izzo (Izzo), Zonatherm's president, the contact list was "a valuable reference document for [salespeople] to decide how to spend their valuable time in order to create business for Zonatherm."
    Albert Izzo (Albert), who founded Zonatherm in 1969, started his business by making cold calls to engineers and eventually calling mechanical contractors and owners. He found the names of companies in the telephone book but had to "dig" for the names of the actual decision-makers for the companies. Only the decision-makers had the authority to purchase Zonatherm's products. Discovering the appropriate buying authority within each customer's company was a time-consuming process. Albert said it required taking many people out to lunch to discover who was the right buyer within each company. When Albert handed the business over to his son Stephen in 1989, Zonatherm had 1,000 "good" repeat customers. That number grew to 2,000 customers by the time of the preliminary injunction hearing. Zonatherm's contact lists were loaded onto the company's computer system sometime between 2000 and 2001.

2. Buyer histories including bid and sales quotations
    Zonatherm's website also stored customer orders, invoices, and

billing information. The information indicated each customer's order status, shipment, spare parts lists, billing address, the date the account was opened, their last payment, and amount due. Izzo testified the buyer histories recorded how much revenue each customer generated for Zonatherm. The sales quotations, which included outstanding quotes, quotes that needed maintenance, and completed or rejected special feature authorizations, were also part of the buyer history. The data on ongoing activity and proposed bids were important in assessing the value of each customer. Zonatherm's policy required all salespeople who acquired quotes from Liebert's system to upload those quotes from their computer to Zonatherm's server. Izzo admitted once potential customers were quoted a price, Zonatherm could not control who saw the price.

3. Price books

The price books, according to Barnett, are highly confidential and are not available through "liebert.com," the website available to the public. The price books are very complex engineered-to-order solutions that allow salespeople to do a complete price work-up and quotation, complete with factory options. The price books have a tool that allows salespeople to build the information into a proposal they can hand to a customer. The El.net site also contains sales policy and procedure manuals telling salespeople how they can use sales multipliers and discounts when calculating a bid. Before El.net was established, salespeople would spend hours generating a quote manually.

*C. The Security Measures Liebert and Zonatherm Used to Protect the Information*

Barnett described the security measures applicable to the customer contact information, sales quotations, and the price books.

In order to access information on Liebert's websites, a salesperson needed a unique identification number and password. The only way a salesperson could be assigned an identification number and password was if a principal from his representative office requested it. Passwords were assigned on a need-to-know basis. Approximately 600 sales associates who are not Liebert employees have access to the El.net site, but all need a password to access its information. A confidentiality statement appeared whenever anyone accessed a price book online.

William Macaluso (Macaluso), Zonatherm's sales manager, testified it was his job to ensure employees did not take any of Zonatherm's proprietary information when they left the company. Before Zonatherm started storing its information on computers, Macaluso would collect any physical copies of contact lists or price books. Since the informa-

tion is now stored on office computers which typically remain in the office after an employee leaves, Macaluso changes the access codes so the employee leaving cannot access the server. Employees were allowed to take only their personal belongings when they left the company.

Although Macaluso did not delete Zonatherm files from Mazur's laptop when he left, Macaluso did delete Zonatherm documents from Belluomini's desktop computer when he resigned and took the computer with him.

### III. The Alleged Misappropriation

Plaintiffs' allegations of trade secret misappropriation are hinged on Mazur's computer activities before and after he resigned his position at Zonatherm. Most of the evidence regarding his activities was presented through the testimony of Mazur and plaintiffs' expert witness, Lee Neubecker (Neubecker).

### A. Mazur's Testimony

Mazur testified that on January 20, 2004, he was in Zonatherm's offices from 9 a.m. until he resigned at 3:30 p.m. Mazur admitted that on that same day, he downloaded all the price books and from 5 to 20 quotations from Zonatherm's server onto his laptop computer. He also admitted copying quite a bit of information from the system onto his laptop computer on January 19.

According to Mazur, he copied the price books and quotes because he was trying to create a "close-out" document for his team to ensure that the documents and quotations on order had a price reference. He did not ask another team member to collect the information he copied onto his laptop because other team members did not have access to all the information on his computer.

Mazur also copied the information to insure he would receive his proper commission for any sale pending. He received two commission sheets after he left Zonatherm—one in February and one in March. Each commission sheet listed names of Zonatherm's customers and how much money Zonatherm collected from them during the month.

Mazur did not believe the price books were confidential, although he testified he would not share price books with competitors. He did not believe he did anything improper by downloading the books, nor did he intend to use the information improperly. When he resigned, he told Izzo and Macaluso that he would be working for APC. He was not asked for his laptop when he left.

Mazur said he did not use the information from the time he copied the information until the time of the lawsuit. The price books and

quotation information were saved in a zip file on his computer. On February 5, 2004, Mazur was served with plaintiffs' complaint and motion for preliminary injunction. Plaintiffs' counsel asked Mazur whether, on February 5, 2004, he put all of the information he had downloaded into a zip file, but Mazur was evasive in his answers, as illustrated in the following excerpt:

"Q. And then that same day in the afternoon or evening you took all the information that you had downloaded on January 20th, and you put it into a zip file; isn't that correct?

A. Actually, I believe that the zip file was created before that.

\* \* \*

Q. Isn't it true that in the afternoon or evening of February 5, 2004, you downloaded to the Zurich Zip file all the material information that you had taken and downloaded on January 20th at Zonatherm and Liebert? Isn't that true, sir?

A. Again, I believe, to my best knowledge, I created that prior—on or before the 5th. So the answer would be no.

Q. No, that's not true?

A. I believe it was done before that.

Q. It's not a trick question.

A. I'm sorry.

Q. Now, isn't it true, then, sir, that you then downloaded the Zip file to a CD burning file, isn't that true, on February 5th or 6th, 2004, after you were served with the notice of motion? Isn't that true, sir?

A. That's not true.

Q. And isn't it true, sir, that after you were served on February 5, 2004, you proceeded to download all that information to a CD?

\*\*\*

A. I attempted to create a CD with that information, that is correct.

Q. And isn't it true, sir, that some of the information got on the disks; isn't that true?

A. That is what I'm not aware of."

Plaintiffs' counsel then referred to Mazur's deposition testimony, where when asked if he put any information on disks, Mazur answered, "There was some information on disks."

Mazur said he attempted to save the zip file on a compact disk (CD) and that he intended to give the CD to another Zonatherm employee to give to Steve Izzo, his former boss at Zonatherm. Mazur thought the information might answer any questions that could arise concerning a job he quoted. He did not believe he successfully saved the files on the CD, also known as "burning," because when he put the CD back into the computer, he could not access any information

from it. Mazur then deleted anything associated with Zonatherm or Liebert from his laptop computer's memory. He said he deleted the information because it was no longer needed.

### B. Neubecker's Testimony

The trial court qualified Neubecker to testify as an expert in computer forensics. On February 25, 2004, plaintiffs retained Neubecker to examine the hard drive on Mazur's laptop computer. Neubecker made an exact copy of Mazur's hard drive and then performed extensive searches of the hard drive for any information related to Liebert or Zonatherm. He found evidence that showed Mazur accessed the Liebert website on January 20, 2004, and downloaded files. Plaintiffs provided copies of files from their websites so Neubecker could compare that information with the contents of Mazur's laptop. Neubecker found five files on Mazur's computer exactly matched five price book files provided by plaintiffs.

Neubecker testified Mazur downloaded the files and put them into a zip file entitled "a 12 bypass and distribution.doc." Mazur then moved that file into another zip file called "Zurich zip." The "Zurich zip" file contained most of the price book documents.

On February 5, 2004, at 5:35 p.m., Mazur added "newfolder.zip" to the "Zurich zip" file. "Newfolder.zip" contained a lot of Liebert and Zonatherm documents, including quote histories and budgets. Three minutes later, "Zurich zip" was copied to the "CD burning" folder. Neubecker testified when a computer user chooses to copy files from the hard drive to a CD, the computer automatically copies the files and places them in the "CD burning" folder on the hard drive. That way, the computer only has to access one folder when it copies, or "burns," the information onto the CD. Neubecker said most computer users are not aware of the "CD burning" folder. One file in the CD burning folder contained "somewhere in the realm of 40 banker boxes or more" of information belonging to Liebert. The only place Neubecker found the "Zurich zip" file was in the "CD burning" folder because Mazur deleted it from its original source. The zip files Neubecker discovered in the "CD burning" folder "were destroyed and irrecoverable off the computer with the exception of a few files."

Neubecker said the fact that the "Zurich zip" file was in the "CD burning" folder three minutes after the "newfolder.zip" file had been copied into it made it more likely than not that Mazur successfully burned the CD.

On February 6, 2004, the day after the "Zurich zip" file was copied to the "CD burning" file, a "mass wave of deletion" began. Over the next few days, Mazur deleted approximately 12,000 files from his computer.

On February 8, 2004, Mazur deleted 4,000 files, including the "12 bypass and distribution" zip file which contained price books. That file also had existed in the "Zurich zip" file. The fact that the "12 bypass and distribution" file was deleted on February 8 indicated Mazur was going back to look for and delete any remaining files.

Neubecker discovered Mazur also purged his computer's application log sometime on February 9. The application log tracks when different programs, such as the CD-ROM program, are used. It records when the program to burn a CD starts and finishes. The log records how many CDs were successfully burned. Because Mazur deleted the application log from his computer, Neubecker could not determine with certainty whether Mazur successfully created a CD.

Neubecker said it was possible for a computer to delete information in the "CD burning" folder after a CD was burned successfully. He also described several situations where the information would remain in the "CD burning" folder after a successful burn:

> "Within the Windows program, *** you can choose to keep the file there, burn another [CD], leave the session open, or if you just close the program and if your power were lost on a laptop *** [the file in the 'CD burning' folder] would remain."

IV. The Trial Court's Ruling

The trial court denied the plaintiffs' motion for a preliminary injunction. The court found the plaintiffs did not establish a clearly ascertainable right to an injunction or a likelihood of success on the merits. First, the court found the plaintiffs did make a *prima facie* case that the price books were trade secrets because they contained information that was not readily available. The court found that the customer lists were not trade secrets because they were easily duplicated and available in a competitive industry. Although the plaintiffs showed Mazur downloaded price books onto his computer, the court found that Mazur erased all of the information he took, and there was not a "fair chance from the evidence presented" that the price books still existed or that anyone else took price books. The court further found there was no fair chance of succeeding on the question of whether defendants used the price books before they were destroyed. The court found plaintiffs' allegations of irreparable harm were speculative.

On appeal, plaintiffs contend the trial court abused its discretion when: (1) it found the customer lists were not trade secrets; (2) it failed to decide whether the sales quotations were trade secrets; (3) it found plaintiffs did not present a fair question on the likelihood of success on their trade secret misappropriation claims because

defendants no longer had the information; (4) it found no fair question that defendants would inevitably use the trade secrets; and (5) it found plaintiffs' allegations of irreparable harm were speculative.

DECISION

I. Scope of the Appeal

First, we want to clearly identify which categories of information are the subject of this appeal.

In this case, plaintiffs based their motion for a preliminary injunction on their claim that defendants misappropriated their trade secrets in violation of the Illinois Trade Secrets Act (Act) (765 ILCS 1065/1 *et seq.* (West 2002)). The trial court limited its examination of the alleged trade secrets to two types of information: plaintiffs' customer lists and their price books. The trial court found plaintiffs presented a fair question that the price books contained trade secrets. The trial court reached the opposite conclusion with respect to the customer lists.

Plaintiffs contend the trial court abused its discretion when it failed to consider the bids and quotations, while defendants contend plaintiffs waived any claim to protect the bid history and quotations for two reasons: (1) they failed to produce the information during discovery, and (2) they limited their claim to contact information and the price books at a pretrial proceeding.

We agree with plaintiffs and find no reason for the exclusion of the bids and quotation data: defendants knew the issue was included in the motion and, for the most part, did not object when plaintiffs presented evidence and argument concerning the bids and quotations. When defendants' attorney did object, the trial court allowed the evidence to come in as long as plaintiffs' attorney kept on schedule.

We believe the trial court abused its discretion by failing to decide whether the sales quotations and bids are trade secrets. Both parties have addressed this question in their briefs, and we have found sufficient evidence in the record to allow us to decide the issue on review.

Next, we examine whether the customer lists, bids, and sales quotations are trade secrets. We will not review whether plaintiffs' price books are trade secrets because defendants did not cross-appeal the trial court's finding that they are.

II. Standard of Review

■ A trial court grants a preliminary injunction when it wants to preserve the status quo until it decides the case on its merits. *George S. May International Co. v. International Profit Associates*, 256 Ill. App. 3d 779, 786, 628 N.E.2d 647 (1993); *Dixon Ass'n for Retarded*

*Citizens v. Thompson*, 91 Ill. 2d 518, 524, 440 N.E.2d 117 (1982). A party seeking a preliminary injunction must show: (1) it has a "clearly ascertain[able] right" which must be protected; (2) it is likely to succeed on the merits; (3) no adequate remedy at law exists; and (4) it will suffer irreparable harm absent an injunction. *Gillis Associated Industries, Inc. v. Cari-All, Inc.*, 206 Ill. App. 3d 184, 188, 564 N.E.2d 881 (1990).

On appeal, the decision to grant or deny a preliminary injunction will not be disturbed unless the trial court abused its discretion. *Gillis*, 206 Ill. App. 3d at 189. A trial court abuses its discretion when its findings are against the manifest weight of the evidence. *George S. May*, 256 Ill. App. 3d at 787. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *In re Arthur H.*, 212 Ill. 2d 441, 464, 819 N.E.2d 734 (2004).

### III. Protecting Trade Secrets With Preliminary Injunctions

We must determine whether plaintiffs presented a fair question as to a clearly ascertainable right—specifically, that the customer lists, bids, and sales quotations that defendants allegedly misappropriated are trade secrets under the Act. See *George S. May*, 256 Ill. App. 3d at 787 (under Illinois law, an employer's trade secrets are a protectible interest).

■ The Act, in relevant part, provides:

" 'Trade secret' means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d) (West 2002).

In other words, plaintiffs must meet two requirements to show their information is a trade secret under the Act. First, they must show the information was sufficiently secret to give them a competitive advantage. 765 ILCS 1065/2(d)(1) (West 2002); *Gillis*, 206 Ill. App. 3d at 190-91. Second, they must show they took affirmative measures to prevent others from acquiring or using the information. 765 ILCS 1065/2(d)(2) (West 2002); *Gillis*, 206 Ill. App. 3d at 191-92.

■ In addition to the Act's requirements, courts often consider six common law factors when deciding whether a trade secret exists. See *Stampede Tool Warehouse, Inc. v. May*, 272 Ill. App. 3d 580, 588, 651

N.E.2d 209 (1995), citing *ILG Industries, Inc. v. Scott*, 49 Ill. 2d 88, 273 N.E.2d 393 (1971); *Jackson v. Hammer*, 274 Ill. App. 3d 59, 68, 653 N.E.2d 809 (1995) ("the standards to establish a customer list as a trade secret under the Act parallel the common law standards"). Those factors are:

> " '(1) the extent to which the information is known outside [the plaintiff's] business; (2) the extent to which it is known by employees and others involved in [the plaintiff's] business; (3) the extent of measures taken by [the plaintiff] to guard the secrecy of the information; (4) the value of the information to [the plaintiff] and to [the plaintiff's] competitors; (5) the amount of effort or money expended by [the plaintiff] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.' " *ILG Industries*, 49 Ill. 2d at 93, citing Restatement of Torts § 757, Comment *b*, at 6 (19__).

## A. Customer Lists

█ Whether customer lists are trade secrets depends on the facts of each case. We believe an examination of other cases is instructive.

In *Stampede Tool*, 272 Ill. App. 3d at 582, the plaintiff sold tools to automotive jobbers and developed its customer list by calling service stations and tool dealers to acquire customer names. The court referred to this process as "prospecting." *Stampede Tool*, 272 Ill. App. 3d at 582. Although the service stations and other end users were listed in telephone directories, no one source was available to find jobbers. Once a new customer was found, the information was entered into the plaintiff's computer. Only two key employees had access to the computer. Customer information was given to other employees on a need-to-know basis. All hard copies of the customer list were locked in an office, and salespeople were not allowed to remove customer cards from that office. The plaintiffs also used security cameras, required employees to sign confidentiality agreements, and constantly reminded employees about the list's confidentiality. *Stampede Tool*, 272 Ill. App. 3d at 587. Based on the "laborious method" of creating the customer list and the security efforts used to protect the information, the court decided the customer list met the Act's two requirements and was a trade secret. *Stampede Tool*, 272 Ill. App. 3d at 589.

In *Elmer Miller, Inc. v. Landis*, 253 Ill. App. 3d 129, 134, 625 N.E.2d 338 (1993), the plaintiff, a custom tailoring business, contended its list of over 500 active and repeat customers was a trade secret. The court found the list met the Act's first requirement due to the significant efforts and expense required to duplicate the list:

> "Using a telephone directory, one can easily achieve moderate suc-

cess in finding restaurants or businesses that need cleaning services or office support. The custom tailoring business caters to a far larger pool of individuals with more particular needs ***. The difficulty of developing a cadre of over 500 active, repeat customers for tailored shirts and suits should not be underestimated." *Elmer Miller*, 253 Ill. App. 3d at 134.

The plaintiff also met the second requirement because the customer information was kept in a closed file drawer and salespeople had limited access to it. Salespeople were informed that the customer list was confidential when they joined and left the company. *Elmer Miller*, 253 Ill. App. 3d at 134. After satisfying both statutory requirements, the court found the list was a trade secret.

The court reached the opposite conclusion in *Gillis*, where the plaintiff met only the first of the two statutory requirements. In that case, the plaintiff derived economic value from its list of 3,000 customers who needed its shelving products. *Gillis*, 206 Ill. App. 3d at 190-91. Nonetheless, the customer list was not a trade secret because the plaintiff did not take reasonable measures to protect it. Although only three key employees had access to the list on the plaintiff's computer, there was no evidence physical copies of the list were subject to any restrictions. The copies were not locked in the office; they were not marked confidential; and employees were not instructed on the list's confidentiality. *Gillis*, 206 Ill. App. 3d at 191-92. As a result, the court found the plaintiffs did not present sufficient evidence of a trade secret to warrant a preliminary injunction. *Gillis*, 206 Ill. App. 3d at 192; see *Jackson*, 274 Ill. App. 3d at 67-69 (no trade secret because the plaintiff did not meet either of the statutory requirements—its customers were not secret, and there was no evidence any security measures were used to protect the customer list).

In this case, we believe Zonatherm's contact list met the first requirement of a trade secret under the Act. Albert Izzo testified the customer contact list was generated over a span of 35 years by calling contractors and engineers. Defendant contends Zonatherm's customer list can be easily duplicated because contractor contact information is listed in an online industry directory called "TheBlueBook.com." Although the contractors' names and telephone numbers were listed in telephone directories and directories like "TheBlueBook.com," Zonatherm's sales staff had to conduct additional research through phone calls and lunch meetings to discover the appropriate contacts or authorized buyers within each company.

We believe Zonatherm's method of building its large customer database by discovering and developing relationships with the appropriate buyers is similar to the prospecting done in *Stampede Tool*,

and any attempt to duplicate its contact list from scratch would require significant time, effort, and expense. As a result, we conclude the customer list was sufficiently secret and Zonatherm derived economic value from it.

This finding does not end our analysis. We still must apply the second part of the trade secret definition and assess Zonatherm's security measures. This is where its case flounders. Zonatherm's contact lists were stored on its server. Each salesperson also had an electronic copy of the contact list for his or her assigned territory stored on his or her office computer. Much like *Gillis*, computer access to Zonatherm's customer list was limited on a need-to-know basis, but Zonatherm took no steps to restrict any physical copies of the list. The best evidence of any such restriction was Macaluso's efforts to prevent employees from taking Zonatherm's proprietary information when they left the company. He disabled their access codes and deleted any Zonatherm files from salespersons' computers if they wished to take their computers with them.

Restricting access to sensitive information by assigning employees passwords on a need-to-know basis is a step in the right direction. Nonetheless, we are troubled by Zonatherm's failure to either require employees to sign confidentiality agreements, advise employees that its records were confidential, or label the information as confidential. In all of the cases relied on by plaintiffs where the courts found the trade secrets met the "reasonable steps" test, there was evidence the plaintiffs advised their employees, verbally or in writing, about the information's confidentiality. See, *e.g.*, *Stampede Tool*, 272 Ill. App. 3d at 589 (employees signed confidentiality agreements); *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 875 (N.D. Ill. 2001) (confidentiality agreements and employee handbooks advised of the confidential nature of the plaintiff's information). When such evidence is absent from the record, the plaintiff must show, at a minimum, that its employees understood the information was to be kept confidential. *Gillis*, 206 Ill. App. 3d at 192.

Based on Zonatherm's limited security measures, we conclude the trial court's finding that the customer lists were not trade secrets was not against the manifest weight of the evidence.

We believe the same is true of the business cards Schwabe took when he left Zonatherm and joined Aerico. Zonatherm presented no evidence that it made any effort to prevent employees from removing customer business cards from the premises or advised them the contact information they acquired was confidential.

## B. Bids and Sales Quotations

We apply the same analysis to decide whether Zonatherm's bids

and sales quotations are trade secrets. As with the customer contact lists, we believe plaintiffs failed to show reasonable security measures.

The record contains no evidence showing Zonatherm's salespersons understood the sales and quotation information was confidential. They did not sign confidentiality agreements, the information was not labeled "confidential," and none of Zonatherm's managers testified that they advised salespersons that the information was confidential. Although the Izzos considered the information confidential and valuable, there is no evidence they ever communicated that fact to their employees.

Plaintiffs failed to meet the first requirement for a preliminary injunction with respect to their sales quotations and customer lists: they failed to show the information was a trade secret.

As a result, we confine our review of the remaining issues to the price books. Their status as trade secrets is uncontested.

IV. Plaintiffs' Likelihood of Success on Its Misappropriation Claim

■ Plaintiffs contend they raised a fair question as to their likelihood of success on the trade secret misappropriation claim. Defendants contend the trial court's finding was not against the manifest weight of the evidence because the trial court concluded defendants did not use the alleged trade secrets.

The Act defines misappropriation as the:

"(1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of a person without express or implied consent by another person who:

(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

(I) derived from or through a person who utilized improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.]" 765 ILCS 1065/2(b) (West 2002).

■ In *Strata Marketing, Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1068, 740 N.E.2d 1166 (2000), citing *Magellan International Corp. v. Salzgetter Handel GmbH*, 76 F. Supp. 2d 919, 927 (N.D. Ill. 1999), this court said, "To set forth a cause of action for violation of the Act, a plaintiff must allege facts that the information at issue was: (1) a

trade secret; (2) misappropriated; and (3) used in the defendant's business."

We do not believe *Strata* requires those claiming trade secret misappropriation to show use in every case. First, the above-quoted language can be traced back to *American Antenna Corp. v. Amperex Electronic Corp.*, 190 Ill. App. 3d 535, 538, 546 N.E.2d 41 (1989). The court in *American Antenna* said use is one way to show misappropriation occurred:

> "A misappropriation of trade secrets occurs when a person acquires *or* discovers a trade secret by improper means *or* discloses *or* uses a trade secret in breach of a duty of confidentiality imposed on him by the nature of his relationship with the owner of the trade secret or reposed in him by the owner in disclosing the information, and the owner of the trade secret is damaged by this improper acquisition, disclosure *or* use." (Emphasis added.) *American Antenna*, 190 Ill. App. 3d at 538, citing *Schulenberg v. Signatrol, Inc.*, 33 Ill. 2d 379, 212 N.E.2d 865 (1965).

We believe the three elements of trade secret misappropriation according to *American Antenna* are: (1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation. *American Antenna*, 190 Ill. App. 3d at 538.

Second, *Strata* is easily distinguished from this case. There, the plaintiff did not allege the defendant misappropriated its trade secrets by wrongful acquisition. The plaintiff relied solely on a theory of misappropriation by wrongful disclosure. *Strata*, 317 Ill. App. 3d at 1070-71 (the court ultimately reversed dismissal of the claim based on the inevitable disclosure doctrine); see 765 ILCS 1065/2(b)(2) (West 2002).

Misappropriation can be shown one of three ways—by improper acquisition, unauthorized disclosure, *or* unauthorized use. 765 ILCS 1065/2(b) (West 2002). Based on the statute and the earlier cases, we believe use is just one theory that can be pursued under the Act; it is not the only theory.

Accordingly, we turn our discussion to whether plaintiff presented a fair question of misappropriation under any of the available theories—acquisition by improper means, unauthorized disclosure, or unauthorized use.

According to the Act, misappropriation by " '[i]mproper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." 765 ILCS 1065/2(a) (West 2002).

In *RKI*, 177 F. Supp. 2d 859, defendant Steven Grimes agreed to work for the plaintiff's (his employer) competitor before resigning. Two days before he resigned, he used his password to download 60 megabytes of data from the plaintiff's limited access server to his home computer. *RKI*, 177 F. Supp. 2d at 868. While working for the plaintiff, Grimes signed an employment agreement, which stated he would not disclose his employer's proprietary information. His employee handbook also contained a provision describing the confidential nature of the company's files and information. *RKI*, 177 F. Supp. 2d at 866-67. At some point after the plaintiff filed its complaint, Grimes deleted the information he had downloaded and de-fragmented his computer in a effort to prevent the plaintiff from discovering his actions.[1]

Based on direct and "strong" circumstantial evidence, the United States District Court for the Northern District of Illinois found Grimes improperly acquired the trade secrets by downloading and copying the data for purposes other than serving his employer. *RKI*, 177 F. Supp. 2d at 875. Grimes misappropriated trade secrets under section 2(b)(1) of the Act (765 ILCS 1065/2(b)(1) (West 2002)). *RKI*, 177 F. Supp. 2d at 875; see also *LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 313-15, 849 A.2d 451, 466-67 (2004) (misappropriation by "improper means" acquisition where employee copied his employer's computer files to a CD for personal use before resigning).

■ In this case, we believe plaintiffs proved Mazur acquired their trade secrets by improper means. Mazur admitted downloading several price books onto his laptop computer on January 20, 2004, just hours before resigning and after agreeing to work for a competitor. When the price books were accessed online, a confidentiality statement appeared advising whoever opened the books that the information was proprietary and confidential and "shall be utilized only by current Liebert representatives *for the sole purpose of promoting and securing sales of Liebert products.*" (Emphasis added.) The fact that Mazur attempted to destroy any indication of his downloading activities when plaintiffs filed suit also suggests improper acquisition.

Mazur gives two explanations for his downloading and deletion campaigns, but neither fits the rest of the evidence. The first reason he gives for downloading files—preserving a record for his outstanding commissions—relates only to the bids and quotes he downloaded and shines no light on why he would need to take price books with him.

Second, Mazur said he downloaded the price books so other team

---

[1]"Defragmentation is *** a method to cover up deletions of data by eliminating all traces of deleted data." *RKI*, 177 F. Supp. 2d at 870.

members would know which price book he used to prepare each bid or quote. He contends he "was not certain that his former colleagues would know which revisions of the various price books corresponded with each bid or quote in the close-out document or whether the particular price books would still be on the Liebert server."

If Mazur could acquire the necessary price books online, so could his teammates who had the same access. Furthermore, Zonatherm kept physical copies of the price books in its office, including outdated versions. We see no reason for Mazur to copy the price books onto his personal laptop.

Even more telling is the fact Mazur never actually handed the information over to his teammates before or after he left Zonatherm, and we believe his subsequent deletion efforts contradict any alleged intention to do so. When Mazur received plaintiffs' complaint on February 5, 2004, he also received notice plaintiffs requested the court to order him to return "any and all *** computer disks, diskettes, databases and/or retrievable data *** which reflect, refer or relate to the subject trade secrets, and any copies thereof that may be in defendants' possession."

That same day he compressed the files he downloaded, including the price books, and attempted to copy them onto a CD. He contends his "CD burning" efforts were unsuccessful. Apparently, Mazur's ability to copy material is surpassed by his ability to delete it. Although Mazur attempted to explain many things, he never explained why he deleted an application log that would have conclusively shown whether he burned the price books onto a CD. If Mazur believed he had a valid reason to copy the information for his former teammates, why would he attempt to hide his efforts to do so?

His explanation that he deleted thousands of files because they weren't needed anymore rings hollow. By his own testimony, he was not able to make a copy of the information for his former teammates—information Mazur claimed *they* would need after he left. Apparently their need, and his reason for downloading the price books in the first place, evaporated with the filing of plaintiffs' complaint. Accepting Mazur's testimony at face value requires more gullibility than we are willing to provide.

We can infer from Mazur's spoliation of the evidence on the laptop that he destroyed evidence of misappropriation (*RKI*, 177 F. Supp. 2d at 877, citing *Minnesota Mining & Manufacturing Co. v. Pribyl*, 259 F.3d 587, 606 n.5 (7th Cir. 2001)), leading us to believe Mazur acquired the price books through improper means. Accordingly, we believe plaintiffs presented a fair question on the likely success of their trade secret misappropriation claim against Mazur, and the trial court's findings are against the manifest weight of the evidence.

## V. Remaining Requirements for a Preliminary Injunction

### A. Section 3 of the Act

Finding plaintiffs presented a fair question on misappropriation against Mazur does not end our inquiry into whether preliminary injunctive relief is appropriate. "Injunctive relief, by its nature, addresses only what could happen in the future and cannot remedy misconduct, such as the improper acquisition of trade secrets, that occurred in the past." *LeJeune*, 381 Md. at 315, 849 A.2d at 467 (applying Maryland's version of the Uniform Trade Secret Act). For this reason, plaintiffs seeking preliminary injunctions must show the danger of irreparable harm and the absence of an adequate remedy at law. *Gillis*, 206 Ill. App. 3d at 188.

In actions under the Act, the statute specifies "[a]ctual or threatened misappropriation may be enjoined." 765 ILCS 1065/3 (West 2002). Under Illinois law, courts may also grant injunctive relief to prevent the inevitable use or disclosure of misappropriated trade secrets. *Strata*, 317 Ill. App. 3d at 1070; *Pepsico, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995).

In this case, plaintiffs seek a preliminary injunction to prevent further or inevitable disclosure or use of the trade secrets Mazur misappropriated. Plaintiffs contend there is a real threat Mazur copied the price books onto at least one CD and will continue to use the pricing information to underbid Zonatherm and Liebert.

Using the theory of inevitable disclosure, "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *Pepsico*, 54 F.3d at 1269. If a former employee fulfills a substantially similar position with the plaintiff's competitor, the plaintiff has a better chance of succeeding under this theory. *Strata*, 317 Ill. App. 3d at 1070. The fact that a former employee accepted a similar position with a competitor, without more, will not demonstrate inevitable disclosure. *Pepsico*, 54 F.3d at 1269. Courts will also consider the level of competition between the parties and the new employer's actions to prevent unlawful disclosure of trade secrets. *RKI*, 177 F. Supp. 2d at 876.

In *Strata*, 317 Ill. App. 3d at 1070-71, the plaintiff alleged the defendant, a former employee, had detailed knowledge of its trade secrets, including customer needs, problems, planned product upgrades, and existing contracts. The plaintiff also alleged the defendant was working as a salesperson for its competitor, and the information she acquired was " 'exactly the type of information that any salesperson needs and must use to effectively compete for custom-

ers against [the plaintiff] on behalf of a competitor.' " *Strata*, 317 Ill. App. 3d at 1071. The employee could have utilized the information to underbid the plaintiff, among other things. On appeal, this court held the plaintiff's allegations adequately supported the theory of inevitable disclosure under the Act, and its complaint was sufficient to withstand a motion to dismiss. *Strata*, 317 Ill. App. 3d at 1071, citing *Pepsico*, 54 F.3d 1262. In *Pepsico*, the district court found defendant learned plaintiff's secret pricing, distribution, packaging, and marketing strategies while working as its employee. The defendant began working for a competitor, and the court found he would inevitably use his knowledge of the plaintiff's strategies to make decisions at his new job. On appeal, the Seventh Circuit concluded the trial court's findings were supported by the evidence. *Pepsico*, 54 F.3d at 1269-71.

Although the defendant asserted he did not intend to use the knowledge he acquired while working for the plaintiff, the court was not convinced, in part because he demonstrated a lack of candor when he failed to tell his employer he had been hired to work for a competitor. The fact that the competitor had "an unnatural interest in hiring [the plaintiff's] employees" also weighed against the defendant. *Pepsico*, 54 F.3d at 1271. The court said the defendant "could not be trusted to act with the necessary sensitivity and good faith under the circumstances in which the only practical verification that he was not using plaintiff's secrets would be [defendant's] word to that effect." *Pepsico*, 54 F.3d at 1270.

In this case, the trial court found no fair question on inevitable disclosure based solely on Mazur's testimony that he destroyed his copies of the price books. The court determined Mazur could not disclose Liebert's pricing structure without a copy because the books were too complex.

While a decision regarding a witness's credibility ordinarily is best left to the trial court, that finding can be overturned if the reviewing court believes it is against the manifest weight of the evidence. *Reinneck v. Taco Bell Corp.*, 297 Ill. App. 3d 211, 219, 696 N.E.2d 839 (1998). We believe this case meets the exception and we reverse the trial court's finding on inevitable use.

Plaintiffs' expert witness testified the information on the laptop indicated Mazur attempted and probably succeeded in copying the price books to a CD. Neubecker also described several scenarios in which information would remain in the "CD burning" folder after a successful burn. Mazur's questionable testimony was the only evidence disputing the expert's findings. Had plaintiffs been able to show Mazur successfully burned the CD, the trial court well may have reached a different outcome, which leads us to Mazur's destruction of the

evidence on his laptop's hard drive. Although Mazur's deletion of all the Zonatherm and Liebert files was problematic, we find his decision to purge the application log particularly suspicious.

"Where a party has deliberately destroyed evidence, a trial court will indulge all reasonable presumptions against the party." *R.J. Management Co. v. SRLB Development Corp.*, 346 Ill. App. 3d 957, 965, 806 N.E.2d 1074 (2004). Whether Mazur successfully made CD copies of the price books is a key issue in this case, and, for some unexplained reason, he deleted the application log which would have decisively answered the question. Because Mazur destroyed this crucial piece of evidence, we presume it would have showed he successfully copied the price books onto a CD.

In addition to this presumption against Mazur, the circumstances surrounding his departure from Zonatherm cast doubt on his denials. Not only did Mazur accept a substantially similar sales position with a competitor while working for Zonatherm, he started a competing business two months before resigning and never informed Zonatherm of his intentions until the day he quit. The parties do not dispute Aerico and Zonatherm, and the manufacturers they represent, APC and Liebert, are direct competitors. There is no question Mazur downloaded a substantial amount of Zonatherm's confidential information one day after he signed the agreement with APC. Plaintiffs also presented evidence that APC executives wanted to "cripple Liebert in Chicago for at least six months" by convincing its sales representatives to switch companies. Although Mazur signed an agreement with APC that he would not use Zonatherm's information on behalf of APC, an e-mail from an APC executive indicated that just before Mazur started working for APC he told a Liebert customer that he would approach it with an APC offering. We believe that e-mail supports a finding of inevitable use.

Based on all the evidence presented at the hearing, we reject the trial court's finding on inevitable use.

### B. Irreparable Harm and Inadequate Remedy at Law

Briefly, we also address the remaining requirements for a preliminary injunction—irreparable harm and lack of an adequate remedy at law. The trial court found any harm due to the misappropriation was speculative.

We find nothing "speculative" in defendants' intention to "convert existing business from Liebert," as indicated in numerous exhibits of defendants' e-mails, letters, and business plans. Zonatherm and Liebert presented evidence that although overall sales increased in 2004, they did not meet their sales projections in Zonatherm's terri-

tory. Plaintiffs also presented Izzo's testimony that the price books would allow defendants to strategically underbid Zonatherm when competing for contracts. A 3% to 4% loss in contract prices would compromise Zonatherm's profitability.

Courts have found that the type of competitive losses alleged here often inflict irreparable injury and lack an adequate remedy at law, due to the difficulty in calculating the loss of existing and future business. See *McRand, Inc. v. van Beelen*, 138 Ill. App. 3d 1045, 1055, 486 N.E.2d 1306 (1985) (irreparable harm likely if the defendant was not enjoined from soliciting the plaintiff's customers). We believe the trial court's finding that any irreparable harm was speculative is against the manifest weight of the evidence.

VI. Scope of Injunction

We believe the evidence against Mazur for misappropriation justifies an injunction. This court also must decide whether the injunction should extend to the other defendants. Finding little or no evidence that anyone except Mazur had possession of the price books, we cannot say the trial court abused its discretion when it found plaintiffs did not show a likelihood of success on their misappropriation claim against the remaining defendants.

A trial court has the authority to fashion injunctive relief to the extent reasonably necessary to protect the plaintiffs' rights. See *Stampede Tool*, 272 Ill. App. 3d at 590-91. When imposing a preliminary injunction, courts should seek to prevent the defendant from gaining competitive advantage through the unlawful misappropriation. See *ILG Industries*, 49 Ill. 2d at 97-98.

Usually, courts employ an equitable balancing test to determine whether injunctive relief is properly tailored to the facts. *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 62 Ill. App. 3d 671, 682, 379 N.E.2d 1228 (1978). If the equitable doctrine applies, any harm an injunction would impose on the defendant is weighed against the benefit it would provide the plaintiff. *ABC*, 62 Ill. App. 3d at 682. Courts do not "balance the harms" where defendants acted despite knowledge of the plaintiff's rights and understood the possible consequences. *ABC*, 62 Ill. App. 3d at 682.

In this case, the trial court did not decide whether defendants were shielded by the "balancing of the harms" test. We do not believe the equitable balancing test should be applied to Mazur considering the strong evidence that he wilfully misappropriated plaintiffs' trade secrets.

We remand the cause to the trial court for further consideration of what form of preliminary injunction is necessary to reasonably protect

plaintiffs from any adverse effects caused by Mazur's misappropriation of the price books. Only Mazur is to be enjoined.

CONCLUSION

We affirm the trial court's finding that Zonatherm's customer list is not a trade secret. Although the trial court abused its discretion in failing to consider the bids and sales quotation records, we find plaintiff failed to make a fair showing that the information was a trade secret under section 2(d)(2) of the Act (765 ILCS 1065/2(d)(2) (West 2002)). We also find the trial court abused its discretion when it found plaintiffs did not show a likelihood of success on their trade secret misappropriation claim against Mazur or irreparable harm concerning the price books. We remand the cause and direct the trial court to grant plaintiffs a preliminary injunction against Mazur, reasonable in scope and duration, to prevent any actual or threatened misappropriation of the price books.

Affirmed in part and reversed in part; cause remanded with directions.

GARCIA, J., concurs.

JUSTICE HALL, dissenting:

I respectfully dissent. I do not believe the trial court abused its discretion in finding that the plaintiffs' allegations of irreparable harm were too speculative to support the issuance of a preliminary injunction.

A preliminary injunction is an extraordinary remedy which should be issued only where the moving party clearly shows that if the injunction is not granted, he is likely to suffer irreparable harm before a decision on the merits can be rendered. *Summit Electric Co. v. Mayrent*, 17 Ill. App. 3d 545, 550, 308 N.E.2d 313 (1974); see also *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (showing of irreparable harm is perhaps the " 'single most important prerequisite for the issuance of a preliminary injunction' "), quoting *Bell & Howell Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983). Plaintiffs have failed to make such a showing.

In this case, plaintiffs have attempted to establish irreparable harm based on the theory of "inevitable disclosure." Plaintiffs contend they will suffer irreparable harm if the individual defendants are permitted to conduct business with APC because defendants would "inevitably disclose" plaintiffs' trade secrets to APC giving the organization an unfair competitive advantage. Much of plaintiffs' at-

tack is directed at the credibility of defendant Mazur. Plaintiffs maintain that Mazur has demonstrated a willingness to use or disclose trade secrets and that his testimony that he no longer possesses the price books is incredible, arguing that Mazur would inevitably disclose this information in his new position at Aerico.

Like the plaintiffs, the majority apparently does not believe in Mazur's version of events and finds that it was against the manifest weight of the evidence for the trial court to conclude that Mazur did not successfully copy trade secret pricing information onto a CD before deleting the information from his laptop. I disagree and see no reason to upset the trial judge's credibility determination.

Although a trial court's finding is always subject to review, a "reviewing court will not substitute its judgment as to the credibility of witnesses for that of the trial court, unless the findings are manifestly against the weight of the evidence." *Brown v. Zimmerman*, 18 Ill. 2d 94, 102, 163 N.E.2d 518 (1959). A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly evident. *In re C.N.*, 196 Ill. 2d 181, 208, 752 N.E.2d 1030 (2001). Underlying this rule is a recognition that the trial judge, as the trier of fact, was in a position to actually see the witnesses testify, observe their demeanor, and assess their credibility. *Clean World Engineering, LTD. v. MidAmerica Bank, FSB*, 341 Ill. App. 3d 992, 997, 793 N.E.2d 110 (2003).

The manifest weight of the evidence adduced at the hearing supports the trial court's conclusion that the plaintiffs have failed to present evidence that Mazur has violated or is likely to violate his obligation to keep plaintiffs' information secret. There is no evidence that Mazur has made any disclosure of confidential information to anyone in any part of the APC organization, nor is there any evidence that he would need to do so in order to fulfill his responsibilities at Aerico. There is no evidence that Zonatherm has suffered lost sales or customers or that anyone at APC or Aerico has used plaintiffs' confidential business information. The lack of evidence of harm is not conclusive, but it tends to corroborate Mazur's testimony that no such disclosures have occurred.

In essence, all that is alleged is that the defendants could use or disclose plaintiffs' trade secrets while working at Aerico, and plaintiffs fear they will inevitably do so. Such allegations alone are insufficient to demonstrate irreparable harm. As stated in *Smith Oil*, the "requirement of the showing of imminent injury is not satisfied by proof of a speculative possibility of injury and 'such relief will not be granted to allay unfounded fears or misapprehensions.' " *Smith Oil Corp. v. Viking Chemical Co.*, 127 Ill. App. 3d 423, 431, 468 N.E.2d 797 (1984),

quoting *Barco Manufacturing Co. v. Wright*, 10 Ill. 2d 157, 166 (1956). At this stage of the proceedings, there is no evidence that defendants have used or disclosed plaintiffs' trade secrets, and any suggestion that they will inevitably do so is purely speculative.