2021 IL App (2d) 210208-U
No. 2-21-0208
Order filed December 2, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| TWR SERVICE CORPORATION, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-CH-0547 |
| | ) | |
| TIMOTHY PETERSON and NGN, INC., | ) | Honorable |
| | ) | Daniel L. Jasica, |
| Defendants-Appellants. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not abuse its discretion in denying defendants' motion for sanctions and motion for reconsideration. Affirmed.

¶ 2    Plaintiff, TWR Service Corporation (TWR), sued Timothy Peterson, its former employee, and NGN, Inc. (NGN), a company Peterson formed with TWR's former customer. TWR alleged claims for violation of the Illinois Trade Secrets Act (765 ILCS 1065/1 *et seq.* (West 2020)) and conversion against both Peterson and NGN and claims for tortious interference with business expectancy and breach of contract against Peterson. TWR also unsuccessfully sought a temporary restraining order (TRO) against defendants. Following expedited discovery, TWR was granted

leave to voluntarily dismiss the complaint under section 2-1009 of the Code of Civil Procedure (735 ILCS 5/2-1009 (West 2020)). Defendants moved for sanctions against TWR and its counsel pursuant to Supreme Court Rule 137 (eff. Jan. 1, 2018). The trial court denied the sanctions motion and denied defendants' motion to reconsider the denial of the sanctions motion. Defendants timely appealed. For the reasons set forth below, we affirm.

¶ 3                                I. BACKGROUND

¶ 4      TWR provides metallic plating and finishing services. Peterson is TWR's former production manager. He worked at TWR from January 1, 2001, to March 31, 2019. In 2001, TWR moved its operations from Rosemont to Schaumburg. Between 1999 and 2001, TWR's former owners worked with Joelie Zak, an engineer and environmental consultant with Scientific Control Laboratories, to design and implement a zero-discharge wastewater system at the new Schaumburg facility.

¶ 5                             A. Underlying Litigation

¶ 6      This dispute arose in 2020 after Peterson and TWR's customer, Duro-Chrome Industries (Duro-Chrome), formed NGN to provide metallic plating and finishing services. It was undisputed that Peterson contacted Zak on August 6, 2020, to discuss NGN's retention of her environmental consulting services. A few days later, on August 11, 2020, Peterson e-mailed Zak a copy of NGN's floor plans. Zak relayed her communications with Peterson to Daniel Moore, TWR's owner and president. In the ensuing weeks, TWR and Peterson exchanged correspondence in which TWR sought assurance that Peterson was not misappropriating TWR's allegedly confidential information and trade secrets, including its zero-discharge wastewater system. Peterson maintained that the system was not a trade secret, referring to TWR's online advertisement of the system and the customer tours of the facility that TWR provided.

¶ 7                                         1. Complaint

¶ 8     On September 16, 2020, TWR filed a four-count verified complaint for injunctive relief

and monetary damages. Counts I and II against both Peterson and NGN alleged violation of the

Trade Secrets Act and conversion. Counts III and IV against Peterson alleged tortious interference

with business expectancy and breach of contract. TWR alleged that it "maintains certain

proprietary and highly confidential information and non-public trade secrets that have intrinsic

value," including: (1) "a unique and proprietary zero discharge waste water system (the 'TWR

System')," (2) "production processes and methods," (3) "customer files," (4) "client identities,"

(5) "supplier lists and supplier pricing," (6) "pricing information for specific clients that include[s]

competitive information relative to customers," (7) "bank account information, TWR's general

ledger, and other restricted financial information," (8) "TWR emails relating to the operation of

TWR," and (9) "online banking login information." Regarding the TWR System, TWR alleged:

        "The TWR System was developed in or about 2001 through significant effort. The

    TWR system is unique in the industry. Those knowledgeable of the industry know that the

    TWR System is unique and is highly coveted by customers because of its environmental

    benefits in plating products. As a result, the TWR System gives TWR significant

    commercial advantage in the plating industry."

¶ 9     TWR further alleged that it "takes reasonable steps to protect its Confidential Information

and trade secrets, including: limiting access to Confidential Information to those employees with

a business need for such access; prohibiting employees from disclosing or transmitting sensitive

[or] confidential information, including TWR Confidential information, for non-business

purposes; and instituting practices and policies whereby TWR informed employees regarding

limited access to TWR Confidential Information to upper management, those trusted employees

involved in the actual facilities management, the financial aspects of the company, and those working on specific customer accounts." Moreover, TWR alleged, "[s]uch practices and policies also included, but were not limited to, actually limiting access to those with a need to know, keeping secret information in locked/fireproof cabinets and drawers, requiring the use of password protections for computers, limiting access of computers out in the shop area from accessing the servers in the TWR offices, and password protecting[] access to certain files, and limiting access to secure, cloud-based information."

¶ 10    TWR alleged that, as production manager, Peterson was privy to TWR's confidential information and trade secrets and was required to maintain the confidentiality as a condition of his employment. TWR cited a "Receipt & Acknowledgement of TWR Service Corporation Team Member Manual" (Acknowledgement) that Peterson signed on June 23, 2017. The Acknowledgement provided in relevant part: "I am aware that during the course of my employment confidential business information will be made available to me. I understand that this information is critical to the success of my employer and must not be given out or used outside of the Company's premises or with non-company employees. In the event of termination of employment, whether voluntary or involuntary, I hereby agree not to utilize or exploit this information with any other individual or company."

¶ 11    TWR alleged that, in violation of his obligations, Peterson contacted the officers of its customer Duro-Chrome to develop a competing metal plating business, formed a competing business, and planned to misappropriate and use TWR's confidential information and trade secrets, including the TWR System. According to TWR, when Peterson contacted Zak on August 11, 2020, Peterson stated that he was working with Duro-Chrome to set up NGN and "expressed his intent to Zak to copy TWR's environmental waste production techniques and systems, including

specifically the TWR System" and later sent Zak "plans for a proposed shop layout that incorporated unique and proprietary engineering elements of the TWR System."

¶ 12    TWR further alleged that, on September 10, 2020, Moore met with Jesse Garcia, a Duro-Chrome representative. During the meeting, Garcia allegedly acknowledged the existence of a relationship between Duro-Chrome and Peterson, refused to discuss the specifics, and stated that " 'we have a right to open a plating shop.' " Later that day, on September 10, 2020, Vincent Sabella, Duro-Chrome's vice-president, likewise met with Moore. Sabella allegedly acknowledged working with Peterson, canceled Duro-Chrome's outstanding orders with TWR, and requested that TWR return Duro-Chrome's materials.

¶ 13                    2. Motion for TRO and Preliminary Injunction

¶ 14    In addition to filing the verified complaint, on September 16, 2020, TWR also filed a motion for a TRO and a preliminary injunction. TWR sought to restrain defendants from misappropriating TWR's confidential information and trade secrets, including the TWR System, and to require defendants to return all such information to TWR.

¶ 15    In support of the motion, TWR submitted an affidavit from Zak, in which she recounted her August 6, 2020, telephone conversation with Peterson during which he "wanted to discuss the possibility of having [Scientific Control Laboratories—Zak's company] consult with his business on environmental issues." Zak attested that Peterson informed her that he was no longer with TWR, that he was working with Duro-Chrome to create a new metal plating business, and that he and his partners had purchased a building and were working with a consultant to design the "shop." In response to her inquiry regarding the proposed shop and waste layout, Peterson responded that "he intended the waste layout and processes to be 'identical to TWR.' " According to Zak, a few days

later, Peterson e-mailed her the schematic plans for the shop layout "which clearly were designed to incorporate unique and proprietary engineering elements of the TWR System."

¶ 16    Zak further attested that she consulted with TWR when it created "its unique and proprietary" TWR System. According to Zak, the TWR System is "not generally known by the public. Rather, it is a highly secret process that is known only by select TWR employees, who are granted access to such information, and by me and select [Scientific Control Laboratories] employees solely based on confidential engagement as consultants by TWR." Moreover, "the TWR System is unique, using specific engineering elements," no other metal plating company uses the system, the system's environmental benefits are "highly coveted by customers who seek to brand themselves as environmentally friendly," and TWR's exclusive use of the system gives TWR significant commercial advantage in the plating industry." According to Zak, her company "has always regarded the TWR System as the proprietary intellectual property and trade secret of TWR and has always kept access to the TWR System secret" and that its work on the TWR System was " 'work for hire' with all resulting intellectual property rights belonging to TWR."

¶ 17        3. Answer and Response to Motion for TRO and Preliminary Injunction

¶ 18    On September 21, 2020, defendants filed a verified answer, denying the substantive allegations, and pled as an affirmative defense that the complaint was an "attempt to stifle competition," hinder defendants' activities, and use the justice system to "financially ruin" defendants, rather than to protect trade secrets or confidential information.[1] Defendants also filed

_____

[1] TWR moved to strike the affirmative defense on grounds that it was not cognizable under section 2-613(d) of the Code of Civil Procedure (735 ILCS 5/2-613(d) (West 2020)) and merely challenged the complaint's factual bases. The motion remained pending at the time TWR

a response to the motion for injunctive relief in which it asserted that TWR failed to demonstrate the existence of any trade secret, a violation of any agreement between TWR and Peterson, or the expectation of a continued customer relationship with Duro-Chrome. As supporting exhibits, defendants submitted documents that purportedly reflected TWR's online advertisement of its zero-discharge wastewater treatment system, a third-party company's advertisement for a zero-discharge system for the metal-plating industry, and publicly available information regarding the evaporation systems that NGN considered and ultimately purchased to dispose of wastewater generated from its anticipated business.

¶ 19    Defendants also submitted an affidavit from Sabella, who attested that Duro-Chrome provides metal plating services and "from time to time used to send some it[]s nickel plating projects to [TWR], and did for a number of years." However, on October 29, 2018, Duro-Chrome received correspondence from Moore (TWR's president), "stating that we would no longer be a customer of TWR's as of January 1, 2019," and announcing that Peterson would be leaving his employment with TWR. Sabella further attested that, after confirming with Moore that TWR "no longer wished to have [Duro-Chrome] as one of its customers," Sabella contacted Peterson and inquired as to whether he was retiring from TWR. After Peterson responded that he was being terminated, Sabella asked Peterson if he would be interested in starting a nickel-plating business with him and Margarito Garcia, Duro-Chrome's president. They incorporated NGN on May 8, 2019. According to Sabella, Duro-Chrome "has an extensive list of customers who from time to time require nickel plating work" and that Duro-Chrome and NGN "do not need customers of

---

voluntarily dismissed the case.

TWR." Moreover, Peterson "has never provided me or anyone I know of, with information regarding the other customers of TWR."

¶ 20                    4. Denial of TRO and Grant of Expedited Discovery

¶ 21    On September 22, 2020, the trial court entered an order denying the TRO request, granting TWR's motion for expedited discovery, and scheduling the matter for a November 4, 2020, preliminary injunction hearing. The record does not include a transcript from the September 22, 2020, hearing. Subsequently, on September 29, 2020, the trial court granted TWR's motion for a protective order to govern discovery designated confidential.

¶ 22    Over the next several weeks, the parties engaged in extensive written and oral discovery. Defendants deposed Zak as well as members of TWR's current and former management staff, including: Christian Hurtado—production manager; James Cwik—TWR's quality control manager; Gregory Hiestand—office manager; Mark Slaughter—former co-owner and vice-president; and Delmar Linderman—TWR's former president. Defendants also deposed David Higgins and Shannon Siksnus—contractors who performed construction work at the TWR facility. On October 7, 2020, defendants served a deposition notice for Moore's deposition, but TWR did not agree to the proposed date. Defendants later moved to compel Moore's deposition, but the motion was denied as moot at the time the trial court ruled on the sanctions motion.

¶ 23                           5. Voluntary Dismissal

¶ 24    On October 21, 2020, TWR withdrew its motion for a preliminary injunction and filed a motion to voluntarily dismiss its complaint pursuant to section 2-1009. In an October 29, 2020, order, the trial court granted the unopposed motion for voluntary dismissal and dismissed the matter.

¶ 25                           B. Sanctions Litigation

¶ 26    Meanwhile, on October 26, 2020, defendants filed a motion for sanctions against TWR and its counsel pursuant to Rule 137. The trial court set a briefing schedule on the sanctions motion and scheduled the motion for argument on December 17, 2020.

¶ 27                                1. Sanctions Motion

¶ 28    Defendants argued in their sanctions motion that TWR's complaint and motion for injunctive relief included multiple false allegations and unsupported claims. In challenging the claim that the TWR System was a trade secret, defendants submitted a 2009 article from the North Carolina Division of Pollution Prevention and Environmental Assistance, which purportedly described the entirety of the TWR System. Defendants proceeded to outline the various steps in TWR's wastewater treatment process and cited Zak's acknowledgement in her deposition testimony as to the common and non-public nature of system components and certain steps in the process. Moreover, defendants' proposed expert witness, Jennifer Morningstar, a senior consulting engineer at The Warren Group, Inc., opined that: (1) "[t]he equipment NGN is using for its process wastewater treatment is commonly available and prevalent in the metal finishing industry"; (2) "[t]he application of the equipment NGN is using for its process wastewater is consistent with multiple recommendations in the metal finishing industry"; and (3) "[t]he NGN wastewater treatment process is not a novel one for the metal finishing industry."

¶ 29    Defendants also argued that TWR falsely alleged that it took reasonable steps to protect the alleged trade secrets. Defendants pointed out that the Acknowledgement was not presented to and signed by Peterson until after had had worked at TWR for over 16 years and that the Acknowledgement failed to identify any trade secrets. Defendants argued that all deponents "testified to the same facts, that they never signed any secrecy agreement with TWR, that TWR never asked them to sign any, that TWR never told them that any part of TWR or its facilities is

secret, that they were never asked by anyone to keep anything about TWR secret, and that they were never asked not to talk about the TWR facility to outsiders."

¶ 30    Moreover, defendants submitted affidavits from various individuals, including Peterson's family members and friends, who had visited and/or toured TWR's facility and were never told that any part of the facility was secret or proprietary nor required to sign a confidentiality agreement. Defendants also submitted affidavits from contractors who performed work at TWR's facility. The contractors likewise stated that they were never told that any part of the facility was secret or proprietary nor were they required to sign a confidentiality agreement. They further stated that they had unrestricted access to the facility. In addition, defendants submitted an affidavit from a TWR customer who stated that that the "plating process used by TWR was demonstrated and explained in some detail by both Tim Peterson and Dan Moore," he "saw the entire work facility," TWR's plating operation was "openly shown" to him, and he was never instructed that any of the information was secret or proprietary; nor was he required to sign a nondisclosure agreement.

¶ 31    Regarding TWR's allegation that Peterson encouraged Duro-Chrome to terminate its business relationship with TWR, defendants submitted Sabella's affidavit and the October 29, 2018, correspondence from Moore to Duro-Chrome, to demonstrate that "[i]n reality, the Duro-Chrome customer relationship was terminated by" TWR. Defendants requested an evidentiary hearing and sought sanctions against TWR and its counsel in an amount to compensate for the expenses, including attorney fees, incurred in defending against the frivolous filings. Defendants subsequently filed a motion for leave to amend the sanctions motion to include an affidavit of fees and costs, totaling $67,299.67, as of December 7, 2020. TWR did not file a response to the motion for leave to amend.

¶ 32                    2. Response to Sanctions Motion

¶ 33    TWR and its counsel responded that defendants failed to meet their burden of establishing grounds for sanctions under Rule 137. In addition to arguing the lack of any evidence to establish that the case was brought for an improper purpose, TWR recounted the factual basis for its allegations, citing, *inter alia*, supporting affidavits from TWR's counsel, Moore, and Zak and the deposition testimony of Linderman, Slaughter, and Hurtado. Regarding the alleged trade secrets TWR sought to protect, both Moore and Zak attested to their understanding that the TWR System is unique and proprietary and provides TWR with a commercial advantage. Zak elaborated that Scientific Control Laboratories "is regarded as one of the leading environmental consultants in the metal finishing industry" and represents "over 600 participants in the metal finishing industry," that she "personally do[es] work for over 200 companies in the metal finishing business," and that she is "not aware of another participant in the metal finishing industry that has a zero discharge system identical or nearly identical to the TWR System."

¶ 34    In her affidavit, Zak also explained that she facilitated the design and implementation of the TWR System in 2001 to meet anticipated federal wastewater regulations. Zak further attested that, during her deposition, she was presented with publicly available articles discussing various aspects of the metal finishing process, including the benefits of reducing wastewater during the process. According to Zak, "[n]one of the articles, however, discussed the fully integrated process that I helped to design in the TWR System." Likewise, Moore attested that, "[t]hough some components of the TWR System were commercially obtained from other sources, many components, including specific engineering components are produced and repaired in-house by TWR."

¶ 35    Regarding TWR's efforts to protect its alleged trade secrets, TWR cited Peterson's June 23, 2017, Acknowledgement and a January 4, 2000, consulting agreement between TWR and

Slaughter, prohibiting disclosure of TWR's proprietary information—information that Moore attested would have included the TWR System. In this regard, Zak attested that, while she did not have a written agreement regarding the secrecy of the TWR System, she believed the TWR System to be unique and confidential and that "TWR had attempted to keep knowledge about the operation of the TWR System limited to the firm's management." Additionally, Moore attested that information regarding the components, design, operation, and processes of the TWR System was shared only with select members of TWR's management team. This team included Hurtado, Cwik, and Hiestand, who likewise signed the Acknowledgement.

¶ 36     Moreover, Moore attested that the nature of the facility tours he gave customers and others was "narrow." He "would show customers and others the west side of operations, which contained the racking, sorting and packing operations, but not the east side, which contained the chemical plating." Occasionally, he would "walk people over to the plating area, we would generally stand at a distance from the pickling and rinsing operations." Linderman likewise testified that tours of the facility were limited, that he did not believe he ever told any visitor how individual components of the TWR System worked, and that he regarded the TWR System as privileged information.

¶ 37     Moore further attested that he periodically provided tours to TWR customer quality auditors. He "would take the visitors up on the catwalk next to our plating operations, including the rinsing operations. In general, these tours concerned our plating procedures and systems, and any discussion of water focused on cleanliness and rinse procedures, in order to assure effective plating." During the tours, he "frequently pointed out our efficient wastewater system ***" yet "did not go into detail of its operations and did not expect that any of customers would try to steal our designs to set up competing metal finishing operations." Moore attested that he did not require contractors who did work at TWR's facility to sign a confidentiality agreement, as he did not

anticipate that they would engage in " 'industrial espionage' " and that they "confirmed at their depositions that they never abused our trust in an attempt to figure out the operation of our TWR System."

¶ 38    In addition, TWR's counsel attested that, prior to filing the lawsuit, he became aware of post-TWR employment text messages from Peterson to Hurtado. The text messages reflected Peterson's request "to send those things we talked about" for a meeting with "the guy this morning that needs them. Just between us, only!" TWR's counsel attested that he subsequently learned from TWR and Hurtado that Peterson contacted Hurtado to "gain access into the TWR facility to examine TWR's engineering elements," that Peterson later asked Hurtado to send him photographs of the engineering elements, and that Hurtado refused the requests. The text-message conversation reflects a subsequent text message from Peterson to Hurtado, stating: "Christian, I owe you an apology. I am sorry that I put you in the position to have to make a decision on what was the right thing to do. You did the right thing. I was wrong and I hope you can forgive me." TWR argued that the text messages supported the belief that Peterson sought to misappropriate TWR's trade secrets to benefit NGN.

¶ 39    Addressing the factual bases for the allegations that Peterson tortiously interfered with TWR's business expectancy, TWR cited Zak's initial affidavit in which she recounted her August 2020 communications with Peterson regarding the metal plating business that he was creating with Duro-Chrome. Moore attested that it was "not true" that TWR and Duro-Chrome ceased their business relationship in 2018. Rather, according to Moore, shortly after sending the October 29, 2018, correspondence to Duro-Chrome, he met with Sabella to discuss repair of the relationship. "During that meeting, TWR agreed to continue providing services for Duro-Chrome, and Duro-

Chrome continued to submit orders to TWR until just before TWR filed the Complaint, almost two years later."

¶ 40                              3. Reply in Support of Sanctions Motion

¶ 41    Defendants maintained in their reply in support of the sanctions motion that TWR brought the lawsuit for an improper purpose and submitted a supporting affidavit from Peterson in which he recounted the circumstances surrounding his departure from TWR. Peterson attested that, on January 17, 2018, Moore told him that Hurtado had given notice that he was going to work for a competitor. Later that day, Moore told Peterson that he had been given authorization to sue Hurtado and the competitor's owner and that TWR had "deeper pockets." The next day, Moore told Peterson that TWR would lose the case, but that TWR would destroy Hurtado and the competitor's owner financially. Hurtado subsequently changed his mind and remained at TWR. Peterson expressed his disappointment in the situation to Moore and called Moore a "liar." Moore informed Peterson that, given the lack of trust, Moore "would like for [Peterson] to be gone from TWR by the end of 2018" and that Peterson should write an "exit strategy." It was agreed that Peterson would remain employed at TWR until the end of March 2019. Peterson further attested that, prior to his departure from TWR, he declined Moore's request to sign a non-compete agreement.

¶ 42    Hurtado testified at his deposition that it was possible that he was threatened with litigation but that he did not recall. Cwik was questioned at his deposition about whether there was "any talk" about suing Hurtado when he indicated his intention to work for a competitor in 2018. Cwik responded that "there was a letter written by lawyers that was going to be presented to him," that Moore told him about the letter, but that he did not know "what legal action was going to take place."

¶ 43    In arguing that TWR's allegations were false, defendants submitted charts with citation to deposition transcripts and affidavits to support that there was no evidence that the TWR System was secret; that there was no evidence that any witness signed a confidentiality agreement identifying TWR's facilities or processes or was even asked not to disclose the information; that nothing was concealed from view during tours; and that witnesses had access to the TWR facility without the presence of TWR employees. In addition, Peterson attested that he gave or witnessed "at least 40 tours of the TWR facility at Schaumburg, and possibly more than 100." According to Peterson, during the tours, "no part of the TWR facility was off limits" and "all questions by the person receiving the tours[] were answered to the best of the tour guide's ability, and [he] was never told by anyone not to answer questions during tours." Defendants' counsel attested that he visited the TWR facility in 2005, was never told that "any part of the building was off limits," was never told that "any part of the facility was part of any secret or proprietary system or process," was not asked to sign a confidentiality agreement, and was "free to look at and ask questions about anything." Counsel further attested that he is "a degreed chemical engineer" and that "there is nothing in the TWR facility that is beyond my understanding." Thus, "[i]f [he] had reason to learn the details of the TWR operation, then [he] certainly had the opportunity."

¶ 44    Defendants argued that, in light of TWR's actions, Moore's and Zak's "understanding" that the TWR System is unique and proprietary was irrelevant. Indeed, defendants argued, Zak testified that she had no agreement to maintain the secrecy of the TWR System and was never told that anything at TWR was secret. Defendants submitted a supplemental report from Morningstar, in which she set forth an engineering analysis and discussion of the TWR System and concluded that "[t]he components of the TWR wastewater treatment process and their respective applications

and configurations are all documented in commonly accessible industry literature, published prior to 1999, and are neither secret nor proprietary."

¶ 45    Defendants challenged TWR's argument that Duro-Chrome remained its customer through August 2020 with a supplemental affidavit from Sabella. Sabella attested that TWR and Duro-Chrome did not repair their relationship "to the previous status quo" after Moore terminated the relationship in his October 29, 2018, correspondence. Rather, Sabella attested that he subsequently met with Moore who confirmed the termination of the relationship and stated that acceptance of future orders would be based upon Moore's discretion. Attached as exhibits to Sabella's supplemental affidavit were a litany of correspondence from 2019 and 2020 in which TWR rejected Duro-Chrome job orders.

¶ 46                            4. Ruling on Sanctions Motion

¶ 47    On December 17, 2020, the trial court heard argument on the sanctions motion. Initially, the trial court confirmed that there was no objection to defendants' motion for leave to amend their sanctions motion to include the affidavit of fees and costs. The trial court also clarified that it would bifurcate the sanctions claim and first resolve the threshold issue of whether sanctions were warranted and, if so, set the matter for an evidentiary hearing on an appropriate sanctions award.

¶ 48    Following extensive argument on the threshold question whether sanctions were warranted, the trial court denied the sanctions motion. After recounting the factual background and procedural history of the case and reviewing the relevant case law, the trial court first found no evidence to support the claim that the case was brought for an improper purpose such as to harass defendants or unnecessarily delay or increase litigation costs. The trial court declined to consider Moore's alleged January 2018 litigation threats against Hurtado as supporting evidence. The trial court reasoned that, in addition to Hurtado's testimony that he did not recall receiving such threats,

"more fundamentally," it did not think that an alleged threat of litigation against another employee who considered resigning from TWR was sufficient to allow a reasonable inference of an improper motive in this case.

¶ 49    The trial court also rejected the argument that the complaint was not well grounded in fact. Referring to Peterson's August 6, 2020, phone call to Zak, the trial court found it undisputed that "Peterson informed Zak that he intended to replicate the TWR zero discharge system for a new metal plating operation that he was developing with a prior customer of TWR's, Duro-Chrome, or at least that is what Zak represented to TWR's attorney." Noting Peterson's August 11, 2020, e-mail to Zak, in which he attached the schematic plan for NGN's shop layout, the trial court found it undisputed that Zak, with over 25 years' experience as an environmental consultant in the metal-plating industry, "believed and still believes that the TWR zero discharge wastewater system is unique [and] has not been replicated by others," and that "[n]one of the other 200 metal plating businesses that she has worked with have a system that is identical or nearly identical to the TWR zero discharge system." Thus, "Zak contacted Moore and shared with him her communications with Peterson and her opinions on the zero-discharge treatment system she helped develop for TWR," and "TWR's attorney also spoke directly to Zak before preparing and filing the lawsuit." The trial court concluded that, whether the TWR System was unique or proprietary would ultimately be a question of fact, but that it was "reasonable for Moore's and TWR's attorneys to have relied on Zak's opinion given her broad experience in the industry and specific knowledge of the details of TWR's zero discharge system."

¶ 50    The trial court declined to consider Morningstar's supplemental report on grounds that defendants improperly submitted it for the first time in their reply brief and that, in any event, the report was inadmissible hearsay. Nevertheless, the trial court also pointed out, with respect to both

reports, that Morningstar "largely only contends that the components and the general steps comprising the metal plating zero discharge system are generally available. This does not preclude the manner the system is actually operating or calibrated from being confidential or proprietary."

¶ 51     Moreover, the trial court found it undisputed that Peterson contacted Hurtado after Peterson left TWR's employment and requested interior photographs of TWR's facility. The trial court reasoned that "[t]his would also have naturally raised TWR's suspicions about the intent and conduct of the former employer [*sic*] who had gone to work for a former customer and potential competitor."

¶ 52     Regarding defendants' argument that TWR failed to take appropriate precautions to maintain the secrecy of the TWR System, the trial court noted that "[s]ome, but not apparently all, TWR employees signed a confidentiality agreement, although nothing in the agreements or nothing in the acknowledgement and nothing in the manual that were provided to them specifically called out the TWR zero discharge wastewater system as being proprietary or secret." Nevertheless, the trial court reasoned that "[i]t is also important to recognize that under the Illinois Trade Secret Act, the holder of a trade secret need only demonstrate that they took, quote, reasonable efforts under the circumstances to maintain its secrecy or confidentiality" and that "[w]hat is reasonable is generally a fact-dependent analysis, and there are ultimately six factors that Courts use to determine whether a trade secret exists:" (1) the extent to which the information is known outside the employer's business, (2) the extent to which the information is known by employees and others involved in the business, (3) the extent of the measures taken by the employer to guard the information's secrecy, (4) the information's value to the employer and its competitors, (5) the amount of effort or money expended by the employer to develop the

information, and (6) the ease or difficulty with which others could properly acquire and duplicate the information.

¶ 53    The trial court emphasized that "one of *** the six factors is the extent of the measures taken by the employer to guard the secrecy of the information." The trial court proceeded to reason that, "[w]hile the lack of safeguards to protect the alleged secrecy of the TWR zero discharge system is certainly a most important factor, it is not the only factor, and its absence does not preclude Moore or TWR's attorneys from otherwise having a reasonable belief that a viable trade secret claim might still exist even if it could not demonstrate strong measures to guard secrecy of the information."

¶ 54    The trial court discounted the affidavits from individuals who were provided access to the facility. Noting Zak's attestation that the unique aspects of the system involved the adjustments and calibration of water flow and filtration, the trial court stated that it did not "necessarily strike the Court that simply observing the physical layout or setup of the components of the system on the metal plating plant floor would have divulged any of these alleged trade secrets or proprietary information particularly to persons who are neither knowledgeable nor experienced in the industry such as family members, friends or outside contractors."

¶ 55    As a final matter, the trial court noted the relatively "short-lived" length of the lawsuit—43 days. However, the trial court clarified, "This is not to say that the lawsuit was not very disruptive, inconvenient and costly to the Defendants, but it is to say that once the facts came out in expedited discovery that undercut TWR's position, TWR and its attorneys appeared to have taken seriously their allegations and [chose] not [to] proceed without a continued well-founded basis of fact and law." Thus, under the circumstances, the trial court stated that it "[did] not believe

that the complaint was egregious, frivolous or unfounded based on the facts reasonably then known and as reasonably represented to and reasonably understood by Moore and TWR's attorneys."

¶ 56     In its written December 17, 2020, order, the trial court granted defendants' unopposed amended motion for leave to amend their sanctions motion, stating that the "Affidavit of Fees and Costs attached thereto as Exhibit 1 is deemed to have been filed contemporaneously with and is incorporated into Defendants' Motion for Rule 137 Sanctions." The written order further provided that the sanctions motion was denied for the reasons stated on the record.

¶ 57                              5. Reconsideration Motion

¶ 58     Defendants timely filed a motion to reconsider the denial of the sanctions motion and were subsequently granted leave to amend the motion. Attached to the amended motion was counsel's updated affidavit setting forth a total of $80,403.67 in fees and costs incurred as of February 1, 2021. Defendants argued that no evidence supported the trial court's finding that TWR had a reasonable belief in the existence of a trade secret. According to defendants, the trial court erroneously found that Morningstar's report considered only the components of the TWR System, not the process itself. In addition, defendants challenged Zak's testimony that she was unaware of other clients who used TWR's same evaporation unit. In support, defendants submitted newly obtained evidence in the form of an affidavit from the chief operating officer of a company that sells the evaporation unit. He attested that the unit has been used in the metal finishing industry for the treatment of metal finishing wastewater since year 1989 and estimated that at least 850 units are currently in such use.

¶ 59     Defendants also argued that the trial court misinterpreted the six-factor test for determining the existence of a trade secret by applying equal weight to all factors. However, two of the factors are "not optional"—the extent to which the information is known outside TWR and the extent of

the measures TWR took to guard the information's secrecy. According to defendants, the allegations regarding TWR's efforts to maintain the secrecy of the TWR System were perjured, as demonstrated by the witness testimony. Defendants further challenged the trial court's finding regarding the inability to ascertain the relevant details of the TWR System by a mere tour of the facility on the ground that the finding assumed facts not in evidence.

¶ 60                              6. Ruling on Reconsideration Motion

¶ 61    Following briefing, in which TWR argued that defendants failed to present a permissible basis for reconsideration, the trial court heard argument on the motion on March 26, 2021. At the outset of the hearing, defendants' counsel recited the trial court's finding from the December 17, 2020, ruling on the sanctions motion that, "[w]hile the lack of safeguards to protect the alleged secrecy of the TWR zero discharge system is certainly a most important factor, it is not the only factor, and its absence does not preclude Moore or TWR's attorneys from otherwise having a reasonable belief that a viable trade secret claim might still exist even if it could not demonstrate strong measures to guard secrecy of the information." Defendants' counsel argued that the finding was "exactly contrary to Illinois Trade Secrecy Law," as the "absence of effort to maintain secrecy is in fact an absolute bar to [a] claim for trade secrecy." The trial court responded: "I said strong effort. I didn't say no effort."

¶ 62    The trial court subsequently clarified:

        "I don't think I stated that there were—that I believe you could have a Trade Secret claim with no efforts. I think—what the language that I used—and I think it's still the right language—is in the absence of strong efforts.

In other words, it has to be some effort. The question is: Does it have to be 100 percent effort or does it have to be 10 percent effort and where [] in the continu[um] of what's reasonable under the specific facts and circumstances of the case?

So I don't think I—I don't think I stated, and I certainly didn't mean to state, that no effort you could still have a Trade Secret claim. And that wasn't the basis of my holding.

My basis for my holding was that there weren't necessarily what are typically considered strong or stronger efforts. So I wanted to clarify that issue."

¶ 63    The trial court also noted that TWR ultimately "appeared to acknowledge that there wasn't a Trade Secret" but that "I think I have to be somewhat careful between conflating the issue of whether there actually was a Trade Secret with whether there was a reasonable basis at the time suit was filed to believe that there could be a Trade Secret based on existing law or a reasonable extension or expansion or modification of existing law." Following continued argument, the trial court ruled: "For the reasons stated in my December 17, 2020, ruling [with the] additional comments and clarifications I have made this morning[,] I am going to deny the motion to reconsider." Defendants' counsel continued, "Judge, does your Honor find that they made any efforts whatsoever to maintain secrecy?" The trial court responded, "I have ruled." The trial court also entered a written order on March 26, 2021, denying the amended motion for reconsideration. Defendants timely appealed.

¶ 64    Before turning to the analysis, we note that, at the conclusion of the March 26, 2021, hearing, defendants' counsel orally requested the trial court to vacate the protective order, as "they've not proved a single thing that would indicate they have anything in trade secrecy, nothing in any testimony has ever showed anything secret." TWR's counsel responded that "there are extensive discussions concerning what we still believe to be a confidential process in today's

testimony. We're going to review the transcript and see whether or not we have to make a separate motion with respect to that." TWR's counsel further stated that, "It is still our view that this is proprietary information and we are not inclined to vacate the protective order with respect to anything at this time." The trial court advised defendants' counsel that, in the absence of an agreement to vacate the protective order, a written motion was required.

¶ 65    The record does not reflect that either side filed any further motions with respect to the status of the protective order. The record on appeal in this court includes an impounded record encompassing portions of the record that were designated confidential pursuant to the protective order. These portions include the entirety of defendants' reply in support of their sanctions motion and their reconsideration motion, as well as the entirety of the March 26, 2021, hearing on the reconsideration motion. Nevertheless, there is extensive reference to these purportedly confidential materials throughout the parties' briefs—briefs that the parties did not move for leave to file under seal. We express no opinion on whether discrete portions of the record warranted confidentiality under the protective order but caution that the wholesale sealing of entire portions of the record contradicts the principle that judicial records are presumptively open to the public. See *United Conveyor Corp. v. Allstate Insurance Co.*, 2017 IL App (1st) 162314, ¶ 18 ("[I]nstead of selectively designating truly confidential material pursuant to [the protective] order, the parties, evidently by agreement, designated virtually everything produced in discovery, entire deposition transcripts, and their briefs on summary judgment as confidential. This wholesale effort to keep vast amounts of information out of the public record is unwarranted."). We turn to the parties' arguments.

¶ 66                                II. ANALYSIS

¶ 67    Preliminarily, to contextualize the parties' arguments and the scope of our review, we first consider the standards governing the imposition of sanctions under Rule 137 and elements of a claim under the Trade Secrets Act.

¶ 68                                A. Rule 137

¶ 69    Rule 137 provides that the attorney's or party's signature on a pleading, motion, or other paper certifies "that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Ill. S. Ct. R. 137 (eff. Jan. 1, 2018). Appropriate sanctions against a party or counsel for a filing in violation of the rule may include an order to pay the other party's reasonable expenses, including attorney fees, incurred because of the filing. *Id.*

¶ 70    Accordingly, under Rule 137, sanctions may be granted when: (1) a pleading, motion, or other paper is not well grounded in fact or is not warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law; or (2) it is made for improper purposes such as to harass or to cause unnecessary delay or needless increase in litigation costs. *People v. Stefanski*, 377 Ill. App. 3d 548, 551 (2007). The party seeking sanctions under Rule 137 bears the burden of proof. *Technology Innovation Center, Inc. v. Advanced Multiuser Technologies Corp.*, 315 Ill. App. 3d 238, 243 (2000). The standard for evaluating whether a filing is well grounded in fact and warranted by existing law is objective reasonableness under the circumstances existing at the time of the filing. *Patton v. Lee*, 406 Ill. App. 3d 195, 202 (2010). A finding of subjective bad faith is required to award sanctions for a filing made for an improper purpose. *Stefanski*, 377 Ill. App. 3d at 551-52.

¶ 71    The purpose of Rule 137 is to prevent abuse of the judicial process by sanctioning those who file vexatious and harassing actions based on unsupported allegations of fact or law. *Dismuke v. Rand Cook Auto Sales, Inc.,* 378 Ill. App. 3d 214, 217 (2007). The rule is penal in nature and, therefore, must be strictly construed, reserving sanctions for the most egregious cases. *Patton*, 406 Ill. App. 3d at 202. Rule 137 "is designed to discourage frivolous filings, not to punish parties for making losing arguments." *Lake Environmental, Inc. v. Arnold*, 2015 IL 118110, ¶ 15. We review the trial court's denial of the sanctions motion for an abuse of discretion. *Id.* ¶ 16. A court abuses its discretion when no reasonable person would agree with its decision. *Id.* The denial of a reconsideration motion that is based upon a claim of new evidence is reviewed for an abuse of discretion, but the denial of a reconsideration motion that is based upon a purported misapplication of existing law is reviewed *de novo*. *Horlacher v. Cohen*, 2017 IL App (1st) 162712, ¶ 80.

¶ 72                              B. Trade Secrets Claim

¶ 73    The Illinois Trade Secrets Act (Act) defines a "trade secret" as:

> "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
>
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d) (West 2020).

¶ 74    Accordingly, there are two requirements that must be met to establish that information is a trade secret under the Act—that the information was sufficiently secret to give the plaintiff a

competitive advantage and that the plaintiff took affirmative measures to prevent others from acquiring or using the information. *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 276 (2005). The following common law factors are also considered in determining the existence of a trade secret under the Act: (1) the extent to which the information is known outside the employer's business, (2) the extent to which the information is known by employees and others involved in the business, (3) the extent of the measures taken by the employer to guard the information's secrecy, (4) the information's value to the employer and its competitors, (5) the amount of effort or money expended by the employer to develop the information, and (6) the ease or difficulty with which others could properly acquire and duplicate the information. *Id.* at 276-77 (citing *ILG Industries Inc. v. Scott*, 49 Ill. 2d 88, 93 (1971) (citing Restatement (First) of Torts § 757 cmt. b (1939))); accord *National Tractor Parts Inc. v. Caterpillar Logistics Inc.*, 2020 IL App (2d) 181056, ¶ 41. "Of these factors, the most important is whether and how an employer acts to keep the information secret." *Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 740 (2009).

¶ 75                              C. Application of Rule 137

¶ 76    We turn to defendants' arguments in support of reversal. Defendants neither challenge the trial court's finding that the alleged January 2018 litigation threat to Hurtado was insufficient to support a reasonable inference that the instant case was filed for an improper purpose, nor develop a legal argument that the case was filed for an improper purpose. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (an argument must "contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on").[2] Moreover, defendants do

---

[2] Defendants also failed to provide a single record citation in the argument section of their opening brief in violation of Rule 341(h)(7). While this failure may result in forfeiture of the

not develop a legal argument that the allegations regarding the first element of the trade secret claim—the proprietary nature of the TWR System—warrant sanctions under Rule 137. Nor do defendants develop a legal argument that the allegations regarding interference with TWR's business expectancy warrant sanctions under Rule 137.

¶ 77    To the contrary, in their reply brief, defendants narrow their argument in support of reversal, arguing that the false allegations regarding the second element of the trade secret claim— TWR's efforts to maintain the secrecy of the TWR System—supported an award of sanctions under Rule 137 and is "the reason why this honorable Court should reverse" the trial court's denial of the sanctions motion and amended reconsideration motion. They argue that the trial court failed to recognize that the existence of such efforts is a required element under the Act and that discovery disclosed no TWR efforts to maintain the system's secrecy. We address these arguments *seriatim*.

¶ 78                    1. Trial Court's Application of the Act

¶ 79    Defendants maintain that the trial court misapplied the law with respect to a threshold requirement for the existence of a trade secret under the Act—reasonable efforts to maintain the secrecy of the TWR System. See 765 ILCS 1065/2(d)(2) (West 2020). According to defendants, the trial court "held that an absence of efforts to maintain secrecy could still result in the Plaintiff believing that it had a trade secret."

¶ 80    The entirety of the trial court's ruling belies defendants' argument. In denying the sanctions motion, the trial court concluded that the absence of "strong measures" to guard secrecy of the

_____

argument (see *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12), we determine that the deficiency ultimately does not preclude our review of defendants' argument but caution regarding procedural compliance.

TWR System did not preclude TWR from having a reasonable belief in the existence of a trade secret claim. Moreover, in denying the amended reconsideration motion, the trial court clarified, "I certainly didn't mean to state[] that no effort you could still have a Trade Secret claim. And that wasn't the basis of my holding." Rather, the basis for its holding was that the absence of "strong or stronger efforts" did not preclude a reasonable belief in the existence of a viable trade secret claim. The trial court reasoned that there "has to be some effort," stated that the issue was "what's reasonable under the specific facts and circumstances of the case," and ultimately concluded that the allegations did not warrant Rule 137 sanctions. This is precisely the consideration that must be utilized in resolving whether a plaintiff took affirmative measures to prevent others from acquiring or using the information. See *id.* (defining "trade secret" as, *inter alia*, information that "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality"). Accordingly, we reject defendants' argument that the trial court misapplied the law for determining the existence of a trade secret under the Act.

¶ 81                                    2. Reasonable Efforts

¶ 82    The crux of defendants' argument is that sanctions were warranted because they demonstrated that the allegations regarding TWR's efforts to maintain the secrecy of the TWR System were known to be false when pled. According to defendants, the entire current and former management staff at TWR testified to a lack of efforts made by TWR to maintain secrecy. Namely, the witnesses testified that TWR never advised that the TWR System was secret nor requested that the information remain secret. Moreover, defendants argue that the numerous affidavits from individuals who toured TWR's facility or performed work at the facility established unrestricted access to the TWR System and confirmed no efforts to conceal any information.

¶ 83     TWR responds that the trial court did not abuse its discretion in declining to award sanctions where evidence in the record supported TWR's and its counsel's reasonable belief that TWR had undertaken the requisite efforts to maintain the secrecy of the TWR System. According to TWR, evidence confirming these efforts as well as the procedures TWR maintained to protect the confidentiality of the TWR System included the use of Acknowledgements and confidentiality agreements, limiting employee access to important technical information, and restricting access to the TWR System during site visits.

¶ 84     In considering both sides' arguments, we remain cognizant that defendants, as the parties seeking sanctions under Rule 137, bore the burden of proving that TWR's filings were not well grounded in fact. See *Technology Innovation Center*, 315 Ill. App. 3d at 243. The underlying issue we must decide is whether the trial court abused its discretion in finding that TWR and its counsel had a reasonable belief at the time of filing that that the TWR System warranted protection under the Act for purposes of Rule 137. See *Lake Environmental*, 2015 IL 118110, ¶ 15 (Rule 137 "is designed to discourage frivolous filings, not to punish parties for making losing arguments."). In considering the trial court's determination in this regard, we of course remain cognizant that Rule 137 must be strictly construed with sanctions reserved for the most egregious cases. *Patton*, 406 Ill. App. 3d at 202.

¶ 85     Ultimately, to prevail on its trade secrets claim under the Act, the holder of a trade secret must demonstrate reasonable efforts under the circumstances to maintain its secrecy or confidentiality. 765 ILCS 1065/2(d)(2) (West 2020). The record demonstrates that the determination of whether TWR made reasonable efforts under the circumstances to maintain the secrecy or confidentiality of the TWR System would have been sharply contested had TWR not

voluntarily dismissed its case. As to this question, we express no opinion on whether TWR's claims should have prevailed.

¶ 86    Turning to the merits of the Rule 137 question, we first address TWR's reliance upon its use of Acknowledgements and confidentiality agreements to support evidence of reasonable efforts. The record demonstrated that members of TWR's management staff, including Peterson, Hurtado, Cwik, and Hiestand, signed the Acknowledgement, although years after installation of the TWR System, recognizing that employment at TWR would allow access to confidential business information and that this information "must not be given out or used outside of [TWR's] premises or with non-company employees." TWR also cites the January 4, 2000, consulting agreement between TWR and Slaughter, prohibiting disclosure of TWR's proprietary information, as evidence of its efforts to protect trade secrets. Slaughter remained a consultant for TWR after his employment there. His consulting agreement with TWR specified that he would be privy to TWR's proprietary information and prohibited disclosure of the information. Slaughter confirmed in his deposition that he never violated the agreement. Moore attested that the proprietary information set forth in the agreement would have included the TWR System.

¶ 87    Nonetheless, nothing in these documents specified the propriety or secret nature of the TWR System. We recognize that, under such circumstances, courts have rejected reliance upon confidentiality provisions alone to establish reasonable efforts under the Act to maintain the secrecy of a trade secret. See, *e.g.*, *Arcor, Inc. v. Haas*, 363 Ill. App. 3d 396, 402 (2005) ("[W]e cannot find that the limited security measure of a confidentiality agreement is sufficient to satisfy the second element of a trade secret."); *Gillis Associated Industries, Inc. v. Cari-All, Inc.*, 206 Ill. App. 3d 184, 191 (1990) (rejecting the plaintiff's reliance on an employee manual confidentiality provision to establish reasonable efforts to protect the secrecy of its customer list, where, *inter*

*alia*, "[n]oticeably absent from the paragraph [] is what 'information' plaintiff deemed confidential").

¶ 88     In further support that it employed reasonable efforts to protect trade secrets, TWR cited evidence that it limited employee access to important technical information at the company. Specifically, Moore attested that information regarding the components, design, operation, and processes of the TWR System was shared only with select members of TWR's management team. Zak corroborated this, attesting that, while she did not have a written agreement regarding the secrecy of the TWR System, she believed the TWR System to be unique and confidential, that her company "has always kept access to the TWR System secret," and that "TWR had attempted to keep knowledge about the operation of the TWR System limited to the firm's management." TWR further points out that defendants did not identify any witness, other than the management team and consultants, who acquired critical knowledge about the operation of the TWR System.

¶ 89     Concerning evidence of site visits and tours of the TWR facility, defendants submitted affidavits from numerous individuals, including Peterson's family members and friends, who visited and/or toured the TWR facility and stated that they were never told that any part of the facility was secret or proprietary nor required to sign a confidentiality agreement. Defendants also submitted affidavits from contractors, who stated that they had unrestricted access to the facility, and an affidavit from a customer, who stated that Peterson and Moore demonstrated and explained TWR's plating process and that the plating operation was "openly shown" to him. In addition, Peterson attested that he gave numerous unrestricted tours, and defendants' counsel, with a degree in chemical engineering, attested that he had unrestricted access to TWR's facility during a 2005 visit.

¶ 90    However, the trial court found these affidavits inconsequential. Noting Zak's attestation that the unique aspects of the system involved the adjustments and calibration of water flow and filtration, the trial court stated that it did not "necessarily strike the Court that simply observing the physical layout or setup of the components of the system on the metal plating plant floor would have divulged any of these alleged trade secrets or proprietary information particularly to persons who are neither knowledgeable nor experienced in the industry such as family members, friends or outside contractors." Moreover, TWR relied upon evidence that it restricted access to the TWR System during site visits. Specifically, Moore attested to the restricted nature of facility tours, and Linderman likewise testified at this deposition regarding constraints in the tours.

¶ 91    As a final matter, the trial court found it undisputed that Peterson contacted Hurtado after Peterson left TWR's employment and requested interior photographs of TWR's facility. The trial court reasoned that Peterson's request "would also have naturally raised TWR's suspicions about the intent and conduct of the former employer [*sic*] who had gone to work for a former customer and potential competitor." The trial court was within its discretion in relying upon this information in denying the sanctions motion.

¶ 92    Considering the above evidence, the trial court concluded that defendants failed to establish that TWR's filings were "egregious, frivolous or unfounded based on the facts reasonably then known and as reasonably represented to and reasonably understood by Moore and TWR's attorneys." Given the evidence presented by both parties, and based upon our review of the record, we cannot say that no reasonable person would agree with this decision. See *Lake Environmental*, 2015 IL 118110, ¶ 16.

¶ 93                                  III. CONCLUSION

¶ 94    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 95    Affirmed.